Jennifer A. Golinveaux (SBN: 203056)
JGolinveaux@winston.com
Jeff Wilkerson (SBN: 284044)
JWilkerson@winston.com
Samantha K. Looker (SBN: 340564)
SLooker@winston.com
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1000

Attorneys for Plaintiff
MUSI INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| MUSI INC., | **Case No. 5-24-cv-06920** |
| Plaintiff, | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| v. | |
| APPLE INC., | |
| Defendant. | Date:    November 13, 2024<br>Time:    11:00 A.M.<br>Judge:   Hon. Nathanael Cousins<br>Place:   San Jose Federal Courthouse, Courtroom 5 – 4th Floor |

1

## **NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE THAT on November 13, 2024, at 11:00 A.M., or as soon thereafter

4

as the matter may be heard, in the United States District Court for the Northern District of California,

5

before the Honorable Nathanael Cousins at San Jose Courthouse, Courtroom 5 – 4th Floor, 208 South

6

1st Street, San Jose, CA 95513, Plaintiff Musi Inc. ("Musi") moves this Court pursuant to Federal

7

Rule of Civil Procedure 65(a) for a preliminary injunction to restrain Defendant Apple Inc. from

8

refusing to list or otherwise making unavailable the Musi mobile software application ("Musi app")

9

from the Apple App Store on the basis that the Musi app violates Schedule 1 § 6.3, Schedule 2 § 7.3,

10

and Schedule 3 § 7.3 of the Apple Developer Program License Agreement.

11

This motion is made on the grounds that (1) absent preliminary relief, Musi is likely to suffer

12

irreparable harm; (2) Musi is likely to succeed on the merits of its claims that Apple has breached the

13

Developer Agreement and the implied covenant of good faith and fair dealing; (3) the balance of

14

equities tips sharply in Musi's favor; and (4) a preliminary injunction is in the public interest. *Winter*

15

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

16

This motion is based on the attached Memorandum of Points and Authorities; the Declarations

17

of Jennifer A. Golinveaux, Aaron Wojnowski, and Michael S. Elkin, and the exhibits attached thereto;

18

the related pleadings; and any other matters as may be presented to the Court at or before the hearing.

19

Dated: October 9, 2024                    Respectfully submitted,

20

WINSTON & STRAWN LLP

21

22

By: /s/ Jennifer A. Golinveaux
    Jennifer A. Golinveaux (SBN: 203056)

23

    JGolinveaux@winston.com
    Jeff Wilkerson (SBN: 340564)

24

    JWilkerson@winston.com
    Samantha K. Looker (SBN: 340564)

25

    SLooker@winston.com
    WINSTON & STRAWN LLP

26

    101 California Street, 35th Floor
    San Francisco, CA 94111-5840

27

    Telephone: (415) 591-1000

28

    Attorney for Plaintiff
    MUSI INC.

i

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. RELEVANT FACTUAL BACKGROUND ......................................................... 2

    A.  The App Store ............................................................................................ 2

    B.  Apple's Developer Program License Agreement ...................................... 2

    C.  The Musi App ............................................................................................ 5

    D.  Apple's Unreasonable Removal of the Musi App from the App Store ..................... 5

        1.  Musi's Correspondence with Apple Pre-2024 .................................... 5

        2.  Musi and Apple's 2024 Correspondence and the Musi App's Removal .......... 6

        3.  Aftermath of the Musi App's Removal ............................................... 7

III. ARGUMENT: THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION ............ 8

    A.  Musi is Likely to Suffer Irreparable Harm Without Preliminary Relief ..................... 9

    B.  The Balance of Equities Tips Sharply in Musi's Favor ............................. 11

    C.  A Preliminary Injunction is in the Public Interest .................................... 12

    D.  At a Minimum, there are "Serious Questions" on the Merits of Musi's Claims ........ 13

        1.  Breach of Contract .......................................................................... 13

        2.  Breach of the Implied Covenant of Good Faith and Fair Dealing ................ 17

IV. CONCLUSION ................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdou v. Davita, Inc.*,
   734 F. App'x 506 (9th Cir. 2018) ........................................................................13

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .......................................................................8, 13

*Carma Developers (Cal.) Inc. v. Marathon Dev. Cal., Inc.*,
   2 Cal. 4th 342 (1992) ..................................................................................18

*Chastain v. Howard*,
   2024 WL 508823 (N.D. Cal. Feb. 9, 2024) ..............................................................16

*Congleton v. Nat'l Union Fire Ins.*,
   189 Cal. App. 3d 51 (1987) .............................................................................18

*CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*,
   928 F.3d 832 (9th Cir. 2019) ...........................................................................11

*Env't Democracy Project v. Green Sage Mgmt., LLC*,
   2022 WL 4596616 (N.D. Cal. Aug. 23, 2022) ...........................................................12

*Epic Games v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021), *rev'd in non-relevant part and aff'd in part
   by* 67 F.4th 946 (9th Cir. 2023) ...................................................................9, 10

*Generations at Pinnacle Peak LLC v. Whitestone Pinnacle of Scottsdale - Phase II
   LLC*,
   2018 WL 10407485 (D. Ariz. Jan. 2, 2018) .............................................................13

*Heat Factory USA, Inc. v. Shawbel Techs., LLC*,
   2019 WL 1779579 (S.D. Cal. Apr. 23, 2019) ........................................................12, 13

*hiQLabs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ..................................................................... *passim*

*Intango, Ltd. v. Mozilla Corp.*,
   2020 WL 12584274 (N.D. Cal. Aug. 25, 2020) .......................................................16, 17

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*,
   588 F.2d 24 (2d Cir. 1978).............................................................................11

*Just Tacos, Inc. v. Zezulak*,
   2011 WL 6140866 (D. Haw. Dec. 9, 2011).............................................................12

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
   634 F.2d 1197 (9th Cir. 198) .................................................................................8

*Marder v. Lopez,*
   450 F.3d 445 (9th Cir. 2006) ...............................................................................16

*Merced Prod. Credit Assoc. v. Bayer,*
   222 Cal. App. 2d 793 (1963) ...............................................................................16

*Miller v. Zurich Am. Ins.,*
   41 Cal. App. 5th 247 (2019) ...........................................................................17, 18

*Oasis W. Realty LLC v. Goldman,*
   51 Cal.4th 811 (2011) .........................................................................................13

*Optinrealbig.com, LLC v. Ironport Sys.,*
   323 F. Supp. 2d 1037 (N.D. Cal. 2004) ..............................................................10

*Pappan Enters. v. Hardee's Food Sys.,*
   143 F.3d 800 (3d Cir. 1998) .................................................................................12

*Smith v. San Francisco,*
   225 Cal. App. 3d 38 (1990) .................................................................................18

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001) ...............................................................................11

*Thrifty Payless, Inc. v. The Americana at Brand, LLC,*
   218 Cal. App. 4th 1230 (2013) .......................................................................17, 18

*Victoria v. Super. Ct.,*
   40 Cal. 3d 734 (1985) .........................................................................................16

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..................................................................................................8

**Statutes**

Cal. Civ. Code § 1644 ................................................................................................13

**Other Authorities**

Fed. R. Civ. P. 65 ........................................................................................................8

*Reasonable*, Merriam-Webster.com, https://www.merriam-
   webster.com/dictionary/reasonable (last visited Oct. 4, 2023) ...........................17

**SUMMARY OF ARGUMENT**

**I.      INTRODUCTION**

Defendant Apple's App Store is the only viable means to make iOS-based mobile software applications, or "apps," available to consumers. Plaintiff Musi owns and operates the Musi app, a popular iOS app that is Musi's sole source of revenue. On September 24, 2024, Apple abruptly removed the Musi app from the App Store. While Apple is permitted under its Developer Agreement to "cease marketing, offering, and allowing download by end-users" of apps that Apple "reasonably believes, based [on] human and/or systematic review," infringe the "intellectual property rights of any third party" (Declaration of Jennifer A. Golinveaux ("Golinveaux Dec."), ¶ 2, Ex. A ("Dev. Agmt.") Schedule 1 § 6.3; *see also id.* ¶ 3, Ex. B ("Dev. Agmt.") Schedule 2 § 7.3 & Schedule 3 § 7.3), Apple had no such reasonable belief here, much less a reasonable belief based on a "human and/or systematic review" of the underlying claims that led to the Musi app's removal.

Rather, Apple's removal of the Musi app was based on a five-word complaint dated July 29, 2024 from a complainant identified as "YouTube Legal" ("Complainant"), with no supporting evidence or documentation. Despite Musi's efforts to contact Complainant to understand the basis for its concerns, Complainant—to this day—has failed to respond or to substantiate its accusations. Worse, Apple knew at the time it removed the Musi app that Complainant had failed to substantiate its claims. Apple's improper removal of the Musi app has caused—and continues to cause— substantial and irreparable harm to Musi's business and reputation. Thus, Apple has breached the Developer Agreement and the implied covenant of good faith and fair dealing.

By removing the Musi app from its only viable distribution platform, Apple has exiled Musi from its customer base—thereby threatening the company's survival. Musi is therefore entitled to a preliminary injunction to stop Apple from continuing to breach the Developer Agreement by refusing to list or otherwise making unavailable the Musi app. Apple's obligations are plain, Musi is likely to prevail on the merits, and the Court may enforce the Developer Agreement to protect Musi from incurring further irreparable harm.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    The App Store

Apple designs, manufactures, and sells mobile computing devices, including "iPhone" branded smartphones. iPhones are portable, connect wirelessly to the internet, and enjoy advanced computing capabilities, including internet browsing. *See* Golinveaux Dec. ¶ 4, Ex. C ("Wired.com Article"). To function, iPhones rely on Apple's proprietary mobile operating system called "iOS," which is pre-installed on every device. *See id.* ¶ 5, Ex. D ("Javapoint.com Article"). Users often rely on third-party iOS apps to fully enjoy their iPhone's capabilities.

When the iPhone was launched in 2007, Apple initially refused to host third-party iOS apps. *Id.* ¶ 6, Ex. E ("*Guardian* Article"). However, Apple changed course the following year and launched the App Store—a dedicated online marketplace that allows users to browse and download third-party apps for iPhone. *See id.* ¶ 8, Ex. F ("Apple.com 2008 Article"); *see also id.* ¶ 8, Ex. G ("July 5, 2018 Apple.com Article Titled *The App Store turns 10*"). Today, the App Store hosts nearly two million apps—more than 99.99% of which were developed by third-party developers. *Id.* ¶ 9, Ex. H ("Caminade & Wartburg Study") at p.1.

The App Store is the only viable means by which iOS apps are distributed to consumers. *See id.* ¶ 10, Ex. I ("Morton Paper"). As the developer, owner, and operator of the App Store, Apple enjoys singular power to choose which iOS apps are made available on the platform. *See id.* ¶ 2, Ex. A, Dev. Agmt. §§ 3.2(g), 6.9. Even so, Apple's power is limited by the terms and conditions enumerated in the Developer Agreement, signed by every third party who wishes to distribute an iOS app for the App Store—including Musi. *See id.* ¶¶ 2–3, Ex. A & B, Dev. Agreement; Aaron Wojnowski Declaration ("Wojnowski Dec."), ¶ 5.

### B.    Apple's Developer Program License Agreement

The Developer Agreement grants third-party developers a limited, personal, non-exclusive, and revocable license to use Apple's software and services, provided the developer builds and operates its app in compliance with the Developer Agreement's terms and conditions. Golinveaux Dec. ¶ 2, Ex. A, Dev. Agmt. §§ 1.1, 2.1, 3.2(a). And if a developer wishes to make an iOS app available on the App Store, it must apply for distribution with Apple. *Id.* ¶ 2, Ex. A, Dev. Agmt. §§ 6.1, 6.9.

1    To qualify for distribution, the third-party app must comply with the "Documentation and

2  Program Requirements then in effect as well as with any additional guidelines that Apple may post."

3  *Id.* ¶ 2, Ex. A, Dev, Agmt. § 6.1. Once the app is deemed qualified (*i.e.*, a "Licensed Application"),

4  the third-party developer must agree to additional conditions enumerated in Schedule 1, Schedule 2,

5  or Schedule 3 of the Developer Agreement depending on the app's nature. *See id.* ¶ 2, Ex. A, Dev.

6  Agmt. Purpose.

7    If the third-party app is distributed for free on the App Store, then it is subject to Schedule 1.

8  *Id.* ¶ 2, Ex. A, Dev. Agmt. § 7.1. Schedule 1 § 1.2(b) states that the third-party developer must

9  authorize Apple to "provide hosting services[,] . . . subject to the terms of the Agreement, in order to

10 allow for the storage of, and end-user access to, the Licensed Applications" on the App Store. *Id.* ¶ 2,

11 Ex. A, Dev. Agmt. Schedule 1 § 1.2(b). And Schedule 1 § 4.1(b) requires the third-party developer to

12 guarantee to Apple that "none of the Licensed Applications . . . violate or infringe any . . . intellectual

13 property or contractual rights of any other person, firm, corporation or other entity." *Id.* ¶ 2, Ex. A,

14 Dev. Agmt. Schedule 1 § 4.1(b). If a dispute arises over the content or use of a Licensed Application,

15 the third-party developer must permit Apple to share its contact information with the party filing the

16 dispute and follow Apple's app dispute process "on a non-exclusive basis and without any party

17 waiving its legal rights." *Id.* ¶ 2, Ex. A, Dev. Agmt. § 4.1(g).

18    Relatedly, Schedule 1 § 6.3 states that Apple "reserves the right to cease marketing, offering,

19 and allowing download by end-users of the Licensed Applications at any time, with or without good

20 cause, by providing notice of termination to" the developer. *Id.* ¶ 2, Ex. A, Dev. Agmt. Schedule 1

21 § 6.3. But Schedule 1 § 6.3 goes on to state:

22        Without limited the generality of this Section 6.3, You acknowledge that Apple may
23        cease allowing download by end-users of some or all of the Licensed Applications, or
          take other interim measures in Apple's sole discretion, if Apple *reasonably believes,*
24        *based [on] human and/or systematic review*, and, including without limitation upon
          notice received under applicable laws, that: . . . (ii) those Licensed Applications and/or
25        any end-user's possession and/or use of those Licensed Applications, infringe patent,
          copyright, trademark, trade secret or other intellectual property rights of any third party
26        . . . . (emphasis added)

27

28

If the third-party app charges end-users a fee "of any kind" through its use, the third-party developer must enter into Schedule 2 "before any such commercial distribution of [the] Licensed Application may take place via the App Store." *Id.* ¶ 2, Ex. A, Dev. Agmt. § 7.2. And if the third-party developer wishes to sell its iOS app "for a fee through Custom App Distribution," then the developer must agree to the terms enumerated in another agreement named Schedule 3. *Id.* Like Schedule 1, Schedules 2 and 3 require the third-party developer to warrant that its Licensed Application does not "violate or infringe any patent, copyright, trademark, trade secret or other intellectual property or contractual rights of any other person, firm, corporation or other entity." *Id.* ¶ 3, Ex. B Dev. Agmt. Schedule 2 ¶ 5.1, Schedule 3 ¶ 5.1. Schedule 2 § 7.3 and Schedule 3 § 7.3 are practically identical to Schedule 1 § 6.3, stating in relevant part:

**Schedule 2**

. . .

**7.3.**  Apple reserves the right to cease marketing, offering, and allowing download by End-Users of the Licensed Applications at any time, with or without cause, by providing notice of termination to You. Without limiting the generality of this Section 7.3, You acknowledge that Apple may cease the marketing and allowing download by End-Users of some or all of the Licensed Applications, or take other interim measures in Apple's sole discretion, if Apple *reasonably believes*, *based on human and/or systematic review*, and, including without limitation upon notice received under applicable laws, that: . . . (ii) those Licensed Applications and/or any End-User's possession and/or use of those Licensed Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party . . . . (emphasis added)

*Id.* ¶ 3, Ex. B, Schedule 2 § 7.3.

**Schedule 3**

. . .

**7.3.**  Apple reserves the right to cease marketing, offering, and allowing purchase by Custom App Distribution Customers and download by End-Users of the Custom Applications at any time, with or without cause, by providing notice of termination to You. Without limiting the generality of this Section 7.3, You acknowledge that Apple may cease the marketing and allowing download by End-Users of some or all of the Custom Applications if Apple *reasonably believes*, *based on human and/or systematic review*, and, including without limitation upon notice received under applicable laws, that: . . . (ii) those Custom Applications and/or any End-User's possession and/or use of those Custom Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party . . . ." (emphasis added)

*Id.* ¶ 3, Ex. B, Dev. Agmt. Schedule 3 § 7.3.

### C.   The Musi App

Musi is a mobile computing software company founded in Manitoba, Canada. Wojnowski Dec. ¶ 1. Released in 2013, the Musi app provides users with enhanced functionality to interact with publicly available content on YouTube's website through Musi's augmentative interface. *Id.* ¶ 2. The Musi app does not rely on YouTube's Application Programming Interface ("API"), nor do Musi's servers store, process, or transmit YouTube videos. *Id.* Instead, the Musi app plays or displays content based on the user's interactions with YouTube and enhances that experience via Musi's proprietary technology. *Id.*

Musi remains the sole owner and operator of the Musi App, and since its launch, the app has become popular among younger users. *See id.* ¶ 4. This popularity has allowed Musi to operate continuously for over a decade with a small team headquartered in Manitoba, and, for years, the Musi app has been ranked a top 200 app in the App Store. *Id.* As Musi's only product, the Musi app remains its sole revenue source. *Id.* ¶ 8.

### D.   Apple's Unreasonable Removal of the Musi App from the App Store

#### 1.   Musi's Correspondence with Apple Pre-2024

Since at least 2015, Musi has engaged in sporadic dialogue with YouTube. Wojnowski ¶ 6. Throughout, Musi has repeatedly expressed its commitment to offer the Musi app in a way that complies with YouTube's Terms of Service. *Id.* Accordingly, whenever YouTube has raised concerns with the Musi app's functionality, Musi has, in good faith, either (a) adjusted the app's functionality, or (b) provided details about how the app works and explained why it is fully compliant with YouTube's Terms of Service. *Id.* ¶ 7.

In April 2021, YouTube's outside counsel raised several questions regarding the Musi app's functionality. Declaration of Michael S. Elkin ("Elkin Dec.") ¶ 2. Musi promptly responded and directly answered each question by substantively describing the Musi app's functionality; yet YouTube never replied. *Id.*; Wojnowski Dec. ¶ 7. Instead, in March 2023, YouTube sent a complaint notification to Apple about the Musi app, stating only "YouTube TOS Violations." Elkin Dec. ¶ 3. Musi, again, promptly responded, only to be met again with YouTube's silence. *Id.* Since May 5, 2021—when Musi, through outside counsel, substantively described the functionality and addressed

YouTube's comments—Musi has continued to offer the Musi app on the App Store. Wojnowski Dec. ¶ 7. Musi has conducted routine updates to the Musi app, but the app has otherwise operated in a substantially similar manner since that time. *Id.*

2.   Musi and Apple's 2024 Correspondence and the Musi App's Removal

On August 8, 2024, Apple—via representatives of its App Store—emailed Musi, stating that it had received a notice from "YouTube Legal" on July 29, 2024, stating "that Claimant believes" the Musi app "infringes its intellectual property rights. In particular, Claimant believes [the Musi app] infring[es] its terms of use," and directed Musi to "see their comments below." Elkin Dec. ¶ 4, Ex. A ("Aug. 8, 2024 Apple Email"). The referenced "comments" were five words: "violating YouTube Terms of Service." *Id.*

Apple's August 8, 2024 email did not provide any other details about the basis for Complainant's assertions. Neither the nature of Complainant's intellectual property nor the specific sections of Complainant's Terms of Service allegedly violated were referenced. *Id.* That said, Musi's outside counsel responded to Apple on August 12, explaining that Complainant's accusations were "unsubstantiated," and that Musi had previously contacted Complainant directly to resolve the dispute. *Id.* ¶ 5, Ex. B ("Aug. 12, 2024 Response").

A month later, on September 6, Complainant emailed Apple again and inaccurately claimed that Musi failed to initiate contact to resolve the dispute. *Id.* ¶ 6, Ex. B ("Sept. 6, 2024 Complaint"). In doing so, Complainant carbon copied—without explanation—several third parties that have no apparent relation to the matter. *See id.* In any event, Musi's outside counsel responded to correct the record and reiterated that the Musi app did not infringe Complainant's intellectual property or violate Complainant's Terms of Service. *Id.* Musi's counsel again invited Complainant to discuss its concerns. *Id.* ¶ 7, Ex. C ("Sept. 6, 2024 Email to Complainant"). But again, Musi's counsel did not receive a response. *Id.*

Having heard nothing further from either Complainant or Apple, Musi's counsel followed up with Apple on September 19, and again, on September 24, updating Apple that:

> To date, we have received no communications from the Complainant in response to our September 6 correspondence, nor has the Complainant substantiated its complaint with further details.

> Musi acknowledges under the Apple Developer Program License Agreement that it has agreed to indemnify and hold Apple harmless with respect to claims against its app.
>
> Musi will continue to keep App Store Notices informed as to the status of this dispute.

*Id.* ¶ 7, Ex. D ("Sept. 19 and 24 Emails to Apple"). Apple responded by stating, without acknowledging Musi's prior communications, "your app will be removed from the App Store on the basis of intellectual property infringement." *Id.* ¶ 8, Ex. E ("Sept. 24, 2024 Removal Notice"). Apple removed the Musi app that same day. Wojnowski Dec. ¶ 8. Apple justified its decision by citing Schedule 1 § 6.3, Schedule 2 § 7.3, and Schedule 3 § 7.3 of the Developer Agreement. Elkin Dec. ¶ 8, Ex. E, Sept. 24, 2024 Removal Notice.

### 3. Aftermath of the Musi App's Removal

Apple's abrupt removal of the Musi app from the App Store, despite the absence of any explanation from the Complainant as to how the Musi app infringed Complaint's intellectual property or violated its Terms of Service, and even though Musi has continued to operate the Musi app in a substantially similar manner since May 2021—the last time Musi substantively communicated with YouTube—was arbitrary, unreasonable, lacked good cause, and violated the Development Agreement. *See* Wojnowski Dec. ¶ 7. Apple's actions have also caused immediate, ongoing, and irreparable harm to Musi. Since the app's removal, Musi has received an outpouring of support and complaints about the app's unavailability. *Id.* ¶ 11. Potential customers complain about their inability to download the app. *Id.* And current customers complain about losing access to the app after updating their device and/or version of iOS. *Id.*

As it stands, Musi has no way of helping its customers because of Apple's arbitrary actions. Wojnowski Dec. ¶ 11. Worse, because of the Musi app's removal, Apple no longer permits distribution of the Musi app for internal testing via TestFlight—an online service developed by Apple, which allows for over-the-air installation and testing of iOS apps by iOS developers for development and QA purposes. *Id.* ¶ 12. Through TestFlight, iOS developers—like Musi—receive remote logs, crash reports, and tester feedback about their app from external and internal testers. Specifically, TestFlight allows iOS developers to distribute versions of their app for external beta testers, who provide

feedback about their use. *Id.* This has hampered Musi's ability to continue development on its app, and is a punitive measure that has no bearing on the Musi app's availability on the App Store.

In addition, after Apple's removal of the Musi app, multiple copycat apps have been submitted and published to the App Store using Musi's registered trademark for the term "Musi," as well as its trademarked app icon. *Id.* ¶ 10. These applications have confused and continue to confuse Musi's customers, many of whom deleted the original Musi app thinking that a new version had been published. *Id.* Contrary to its removal of Musi from the App Store, Apple has not removed these apps or revised them in such a way that they no longer infringe Musi's trademarks. *Id.*

The Musi app remains Musi's only source of revenue. *Id.* ¶ 8. Without access to the App Store, Musi lacks the means of updating its app and acquiring new users and thus, lacks the ability to continue operating in the future. *Id.* Unless the Musi app is re-listed, Musi will be forced to terminate its staff and shuts its doors. *Id.* ¶ 9. With no other option, Musi files this motion for a preliminary injunction.

## III.   ARGUMENT: THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION

Federal Rule of Civil Procedure 65 provides for the issuance of a preliminary injunction to "preserve the status quo ante litem pending a determination of the action on the merits." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 198). Musi is entitled to a preliminary injunction if it shows (1) that it is "likely to suffer irreparable harm in the absence of preliminary relief"; (2) that it is "likely to succeed on the merits"; (3) "that the balance of equities tips in [its] favor"; and (4) "that an injunction is in the public interest." *hiQLabs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Ninth Circuit follows a "sliding scale" approach, in which these elements "are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011)). Thus, for example, an injunction can issue if there are "serious questions going to the merits" and the balance of hardships "tips sharply in the [movant's] favor," provided that Musi shows that "there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

As shown in detail below, Musi satisfies all four elements. First, without preliminary relief, Musi will remain exiled from its customer base and thus, faces extinction. Second, the balance of

equities tips sharply in Musi's favor because granting a preliminary injunction will result only in Apple complying with its *own* Developer Agreement, while denying an injunction will likely result in Musi's dissolution. Third, there is a significant public interest in preliminary relief because Apple's conduct implicates nearly 2 million third-party iOS developers who, like Musi, are parties to the Developer Agreement. Fourth, there are—at a minimum—serious questions on the merits of Musi's claims.

Accordingly, this Court should enjoin Apple from continuing to breach the Developer Agreement by refusing to list or otherwise making unavailable the Musi app on its App Store based on an unreasonable belief that the Musi App violates Schedule 1 § 6.3, Schedule 2 § 7.3, and Schedule 3 § 7.3 of the Developer Agreement.

## A.     Musi is Likely to Suffer Irreparable Harm Without Preliminary Relief

By removing the Musi app from its only viable distribution platform, Apple has exiled Musi from its customer base—thereby jeopardizing the company's survival. *See* Wojnowski ¶¶ 8–9. "[T]he threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs*, 31 F.4th at 1188 (quotation omitted). After all, the loss of an enterprise "representing many years of effort and the livelihood of its" owners "cannot be fully compensated by subsequent monetary damages." *Id.* (quotation omitted). Musi thus satisfies the first element for a preliminary injunction.

The App Store is the only viable means by which iOS apps are distributed to consumers. As another Court in this District recently observed: "Apple's creation and cultivation of the iOS device (*and its ecosystem*) has been described as a *walled garden*"; "it is a *closed platform* where Apple controls and supervises access to any software which accesses the iOS devices." *See Epic Games v. Apple Inc.*, 559 F. Supp. 3d 898, 922 (N.D. Cal. 2021) (emphasis added), *rev'd in non-relevant part and aff'd in part by* 67 F.4th 946, 967 (9th Cir. 2023) (noting that "Apple created a 'walled garden' in which Apple plays a significant curating role" because "[d]evelopers can distribute their apps to iOS devices only through Apple's App Store and after Apple has reviewed an app to ensure that it meets certain" criteria). Apple's power is reflected in the App Store's own financials: In 2022 alone, the App Store "attracted over 650 million average weekly visitors" and "users downloaded and redownloaded apps an average of more than 747 million and 1.5 billion times each week." Golinveaux Dec. ¶ 11, Ex. J ("May 31, 2023 App.com Article Titled *App Store developers generated $1.1 trillion in total*

*billings and sales in the App Store ecosystem in 2022*"). At the same time, the App Store enjoys "extraordinarily high" operating margins, with one estimate being "over 70%." *Epic Games*, 559 F. Supp. 3d at 953. Accordingly, "even without comparison to other [app] stores, the operating margins [of the App Store] strongly show market power." *Id.* at 993.

This power has recently attracted regulatory scrutiny. In 2023, the European Commission designated Apple a "gatekeeper" under its Digital Markets Act ("DMA") after finding that Apple's unique market position in iOS gave it "power to create a bottleneck in the digital economy." Golinveaux Dec. ¶ 12 Ex. K ("Sept. 6, 2023 Eur. Comm'n Press Release"); *see also* Council Regul. 2022/1925, 2022 O.J. (L. 265) 1, Recital (13) ("Regulation of the European Parliament and of the Council on Contestable and Fair Markets in the Digital Sector (Digital Markets Act)"). And just this year, the Commission opened a non-compliance procedure against Apple "over concerns that its new contractual requirements for third-party app developers and app stores, . . . fall short of ensuring effective compliance with Apple's obligations under the DMA" and therefore, the preservation of adequate competition. Golinveaux Dec. ¶ 13, Ex. L ("June 23, 2024 Eur. Comm'n Press Release").

The bottom line for purposes of this motion is that, as a walled-in ecosystem, the App Store is the only viable method for distributing iOS apps to end-consumers. Apple's arbitrary removal of the Musi app therefore risks Musi's extinction. *See* Wojnowski Dec. ¶¶ 8–9. That alone merits a finding of irreparable harm. *See, e.g.*, *Optinrealbig.com, LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004) (finding irreparable harm where defendant's conduct threatened plaintiff's continued business operations).

The Ninth Circuit's decision in *hiQ Labs* is instructive. There, plaintiff—a data analytics company—relied on publicly available information from the professional networking website, LinkedIn, to create sellable analytics. 31 F.4th at 1187. After LinkedIn accused hiQ Labs of violating its User Agreement and adopting technical measures to "prevent hiQ from accessing, and assisting others to access, LinkedIn's site," hiQ Labs moved for a preliminary injunction, arguing that LinkedIn's actions threatened its continued survival. *See id.* at 1187–89. The Ninth Circuit agreed, finding there was "no viable way" for hiQ Labs to continue to operate because "hiQ's entire business depends on being able to access public LinkedIn member profiles," and "there is no current viable

alternative to LinkedIn's member database to obtain data for hiQ's" analytical services. *Id.* at 1189. This case is on all fours with *hiQ Labs*. Musi, like all iOS developers, has no viable alternative to the App Store. Without that platform, it simply cannot meaningfully continue to operate.

Apple's conduct also threatens Musi with the "loss of prospective customers or goodwill." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). Without the App Store, the Musi app remains unavailable to all *potential* customers, and *current* customers continue to worry that their access might be discontinued. *See* Golinveaux Dec. ¶ 11. Relatedly, because of the app's removal, Musi can no longer use Apple's TestFlight service, which hampers Musi's ability to distribute test builds of its application and continue development during this period. *See* Wojnowski ¶ 12. And without a presence on the App Store, Musi app customers face an increased risk of confusion relating to the copycat apps that permeate the platform. *See id.* ¶ 10. Courts have found irreparable harm in analogous circumstances. *See John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 29 (2d Cir. 1978) (finding irreparable harm where plaintiff was "deprived totally of the opportunity to sell" its product and, as a result, faced "injury to its goodwill and reputation as a dependable distributor"). Thus, this Court should find that Musi will suffer irreparable harm in the absence of preliminary relief.

**B.     The Balance of Equities Tips Sharply in Musi's Favor**

In determining the balance of equities, this Court must "balance the interests of all parties and weigh the damage to each in determining the balance of the equities." *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 852 (9th Cir. 2019) (internal quotation marks and citation omitted). Here, that analysis tips sharply in Musi's favor.

Musi's side of the scale is weighty. As noted above, without the ability to distribute the Musi app on the App Store, Musi faces inevitable extinction—the exact concern that led the Ninth Circuit to find that "the balance of hardships tip[ped] sharply in hiQ's favor." 31 F.4th at 1190–91 ("On one side of the scale is the harm to hiQ . . . that, without an injunction, it will go out of business.").

Apple, on the other hand, faces little risk or harm. To start, the granting of this motion merely results in Apple being forced to do *what it already promised to do* via the Developer Agreement, and what good faith requires: Conduct a review of Complainant's claims, and only remove the Musi app

from the App Store if it has a "reasonable belie[f]" that the Musi app infringes Complainant's intellectual property and/or Terms of Service. *See* Golinveaux Dec. ¶ 2, Ex. A, Dev. Agmt. § 6.3; *id.* ¶ 3, Ex. B, Dev. Agmt. Schedule 2 § 7.3 & Schedule 3 § 7.3. And if Apple reinstates the Musi app, it faces no risk of liability by Complainant because Musi already agreed to indemnify and hold Apple harmless with respect to any such claim via the Developer Agreement. Golinveaux Dec. ¶ 2, Ex. A, Dev. Agmt. § 10; *see also* Elkin Dec. ¶ 7, Ex. D, Sept. 19 and 24 Emails to Apple.

In other words, any harm incurred by Apple that results from granting this motion is self-inflicted. Apple *chose* to arbitrarily remove the Musi app in breach of its own agreement and its duty of good faith and fair dealing, thereby necessitating the filing of this motion. Thus, the balance of equities tips sharply in Musi's favor. *See, e.g.*, *Pappan Enters. v. Hardee's Food Sys.*, 143 F.3d 800, 806 (3d Cir. 1998) (finding balance of equities favored plaintiff because defendant's "self-inflicted harm by choosing to stop its own performance under the contract and effectively terminat[e] the agreement is outweighed by the immeasurable damage done to the" plaintiff); *Env't Democracy Project v. Green Sage Mgmt., LLC*, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022) ("[T]he balance of equities favors Plaintiff because Defendant's alleged harms are self-inflicted."); *Heat Factory USA, Inc. v. Shawbel Techs., LLC*, 2019 WL 1779579, at *7 (S.D. Cal. Apr. 23, 2019) ("Any harm [defendant] might sustain as a result of an injunction could have been avoided had [defendant] acted in compliance with the License Agreement."); *Just Tacos, Inc. v. Zezulak*, 2011 WL 6140866, at *9 (D. Haw. Dec. 9, 2011) (balance of equities tipped in plaintiffs' favor because defendants "brought on any such difficulties upon themselves").

### C.    A Preliminary Injunction is in the Public Interest

"[T]he public interest inquiry primarily addresses the impact on non-parties rather than parties." *hiQ Labs*, 938 F.3d at 1004 (internal quotation marks omitted). Here, there is a significant public interest in granting preliminary relief.

Apple's conduct implicates nearly 2 million third-party iOS developers. *See* Golinveaux Dec. ¶ 9, Ex. H, Caminade & Wartburg Study; *id.* ¶ 14, Ex. M ("Oct. 5, 2024 Apple.com Article Titled *The apps you love, From the place you can trust*"). Each relies on the App Store for distribution, and each naturally expects Apple to comply with the terms and conditions governing its access, and not to

arbitrarily remove their apps without any reasonable basis. Absent preliminary relief, those developers are sent a disturbing message: Apple is free to destroy their business, whenever it wants, however it wants, and with no obligation to form a "reasonable belief" of any breach of its terms beforehand—despite the Developer Agreement *explicitly* mandating as much.

Denying Musi's motion renders the Developer Agreement a "parchment guarantee"; a legal instrument where Apple is the only party with teeth. Granting Apple such power is inconsistent with the public interest. *See hiQ Labs*, 31 F.4th at 1202 ("[Giving companies like LinkedIn free rein to decide, on any basis, who can collect and use data [on its platform] . . . risks the possible creation of information monopolies that would disserve the public interest."). And, in a general sense, it contravenes the often-recognized public interest of upholding contractual obligations—especially where, as here, 2 million entitles expect those obligations to be honored. *See Abdou v. Davita, Inc.*, 734 F. App'x 506, 507 (9th Cir. 2018) (affirming issuance of preliminary injunction in part because "[t]he public has an interest in . . . enforcing contractual rights and obligations." (quotation omitted)); *Heat Factory USA*, 2019 WL 1779579, at *8 (same); *Generations at Pinnacle Peak LLC v. Whitestone Pinnacle of Scottsdale - Phase II LLC*, 2018 WL 10407485, at *2 (D. Ariz. Jan. 2, 2018) (finding a TRO serves public interest "by ensuring that the parties faithfully uphold their contractual obligations").

### D. At a Minimum, there are "Serious Questions" on the Merits of Musi's Claims

Finally, Musi can establish that its claims are meritorious or, at the very least, that there are "serious questions" on the merits. *Cottrell*, 632 F.3d at 1135 (citation omitted).

#### 1. Breach of Contract

Musi's breach-of-contract claim requires it to prove "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty LLC v. Goldman*, 51 Cal.4th 811, 821 (2011). The only contestable issue here is whether Apple's removal of the Musi app from the App Store breached the Developer Agreement. A plain reading of that Agreement's language confirms that it did.

As with any contract, the Developer Agreement must be construed according to the "ordinary and popular" meaning of its language rather than its "strict legal meaning." Cal. Civ. Code § 1644.

Here, Apple based its removal of the Musi app on perceived violations of Schedule 1 § 6.3, Schedule 2 § 7.3, and Schedule 3 § 7.3 of the Developer Agreement. Elkin Dec. ¶ 8, Ex. E, Sept. 24, 2024 Removal Notice. Thus, this merits evaluation must focus on those provisions, which share nearly identical text. As Schedule 1 § 6.3 states:

> Apple reserves the right to cease marketing, offering, and allowing download by end-users of the Licensed Applications at any time, with or without cause, by providing notice of termination to You. Without limited the generality of this Section 6.3, You acknowledge that Apple may cease allowing download by end-users of some or all of the Licensed Applications, or take other interim measures in Apple's sole discretion, if Apple *reasonably believes, based [on] human and/or systematic review*, and including without limitation upon notice received under applicable laws, that: . . . (ii) those Licensed Applications and/or any end-user's possession and/or use of those Licensed Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party . . . . (emphasis added)

Likewise, Schedules 2 § 7.3 and Schedule 3 § 7.3 state:

**Schedules 2**
. . .
**7.3.**  Apple reserves the right to cease marketing, offering, and allowing download by End-Users of the Licensed Applications at any time, with or without cause, by providing notice of termination to You. Without limiting the generality of this Section 7.3, You acknowledge that Apple may cease the marketing and allowing download by End-Users of some or all of the Licensed Applications, or take other interim measures in Apple's sole discretion, if Apple *reasonably believes*, *based on human and/or systematic review*, and, including without limitation upon notice received under applicable laws, that: . . . (ii) those Licensed Applications and/or any End-User's possession and/or use of those Licensed Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party . . . . (emphasis added)

**Schedules 3**
. . .
**7.3.**  Apple reserves the right to cease marketing, offering, and allowing purchase by Custom App Distribution Customers and download by End-Users of the Custom Applications at any time, with or without cause, by providing notice of termination to You. Without limiting the generality of this Section 7.3, You acknowledge that Apple may cease the marketing and allowing download by End-Users of some or all of the Custom Applications if Apple *reasonably believes*, *based on human and/or systematic review*, and, including without limitation upon notice received under applicable laws, that: . . . (ii) those Custom Applications and/or any End-User's possession and/or use of those Custom Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party . . . ." (emphasis added)

Per the above, Apple needed to conduct a "human and/or systematic review" of Complainant's assertions before taking any action against the Musi app. And once that review was conducted, Apple could only "cease marketing, offering, and allowing download" or "purchase" of the Musi app if it "reasonably believe[d]" that the Musi app "infringe[d]" YouTube Legal's "intellectual property rights."

It does not appear that Apple conducted a "human and/or systematic review" of Complainant's claims, and it certainly did not form a "reasonable belief" that the Musi app infringed Complainant's intellectual property prior to removing the Musi app from its App Store. Indeed, Apple never explained the bases for Complainant's assertions (nor provided any explanation from the Complainant). Instead, Apple merely stated that it received a notice from "YouTube Legal" "that Claimant believes" that the Musi app "infringes its intellectual property rights" and directed Musi to "see their comments below." Elkin Dec. ¶ 4, Ex. A, Aug. 8, 2024 Apple Email. Those comments consisted of five words—"violating YouTube Terms of Service"—which did not explain the nature of Complainant's intellectual property rights nor the Terms of Service supposedly breached. *Id.* Moreover, and shortly before Apple removed the Musi app from the App Store, Musi told Apple:

> To date, we have received no communications from the Complainant in response to our September 6 correspondence, nor has the Complainant substantiated its complaint with further details.
>
> Musi acknowledges under the Apple Developer Program License Agreement that it has agreed to indemnify and hold Apple harmless with respect to claims against its app.
>
> Musi will continue to keep App Store Notices informed as to the status of this dispute.

Elkin Dec. ¶ 7, Ex. D, Sept. 19 and 24 Emails to Apple.

Nothing in this history of correspondence suggests that Apple conducted any "human and/or systematic review" prior to removing the Musi app from the App Store. At best, the record implies that Apple accepted Complainant's bare assertions at face value and used those assertions to destroy Musi's business. That simply is not enough to form a "reasonable belief" that the Musi app violated Complainant's intellectual property rights. And for this reason, Apple breached Schedule 1 § 6.3, Schedule 2 § 7.3, and Schedule 3 § 7.3 of the Developer Agreement.

It does not matter that the "reasonable belief" provision comes after the phrase "Without limiting the generality of this Section." California federal and state courts have consistently effectuated statutory and/or contractual language proceeding similar phrasing. *See, e.g.*, *Marder v. Lopez*, 450 F.3d 445, 451 (9th Cir. 2006) (effectuating waiver provision contained in entertainment contract that proceeded the phrase "Without limiting the generality of the foregoing Release"); *Chastain v. Howard*, 2024 WL 508823, at *2, *4 (N.D. Cal. Feb. 9, 2024) (Pitts, J.) (effectuating waiver provision in marriage settlement agreement that proceeded the phrase "without limiting the generality of the foregoing"); *Merced Prod. Credit Assoc. v. Bayer*, 222 Cal. App. 2d 793 (1963) (finding disputed mortgage "sufficiently covered after-acquired property" based on language that followed "Without limiting the generality of [the previous] subsection"). At best, one might argue that this placement renders the provision ambiguous. But if that were so, then that ambiguity must be construed against the drafter of the Developer Agreement: Apple. *Victoria v. Super. Ct.*, 40 Cal. 3d 734, 739 (1985) ("[A]mbiguities in standard form contracts are to be construed against the drafter").

Apple may also point in opposition to *Intango, Ltd. v. Mozilla Corp.*, 2020 WL 12584274 (N.D. Cal. Aug. 25, 2020) (Cousins, J.), but that case is materially distinguishable—in fact, it helps illustrate the problems with Apple's position. In *Intango*, an add-on developer sued Mozilla because it blocked and disabled several Intango add-ons from Mozilla's Firefox web browser. *Intango*, 2020 WL 12584274, at *1. Intango argued that Mozilla's actions amounted to a breach of § 7 of Mozilla's Add-On Distribution Agreement, which stated:

> Mozilla reserves the right (though not the obligation) to, in our *sole discretion*, remove or revoke access to any Listed or Unlisted Add-ons. This applies, but is not limited to, Add-ons that, in our *reasonable opinion*, violate this Agreement or the law, any applicable Mozilla policy, or is in any way harmful or objectionable. In addition, we may at any time remove Your Add-on from AMO; revoke Your Mozilla Certificate; blocklist an Add-on; delete your AMO account; flag, filter, modify related materials (including but not limited to descriptions, screenshots, or metadata); reclassify the Add-on; or take other corrective action.

*Id.* at *6 (emphasis added). This Court dismissed Intango's claim after finding that, under § 7's "plain terms," the Distribution Agreement granted Mozilla "wide discretion to remove any add-on," and that this language did not require Mozilla to "provide advance notice" or prevent Mozilla "from removing add-ons it had previously approved." *Id.*

1    However, in *Intango*, the "reasonable opinion" language in § 7 of Mozilla's Add-on

2 Distribution Agreement was not at issue—and for good reason. Unlike Apple's conduct here, Mozilla

3 engaged in "extensive" discussions with Intango before blocking and disabling Intango's add-ons from

4 the Firefox web browser. *See id.* at *2–3. Each time Intango inquired into Mozilla's decision, Mozilla

5 named the *exact* provision of the Add-on Distribution Agreement that it suspected the add-ons were

6 violating. *See id.* And on one occasion, Mozilla lifted the block after learning more about their

7 functionality. *See id.* Nothing similar happened here. Apple did not engage in any "extensive"

8 discussions with Musi. To the contrary, Apple ignored Musi's correspondence, made no attempt to

9 communicate with Musi to gather details surrounding its position, and removed the Musi app from the

10 App Store without providing any bases for its belief that the app violated Complainant's intellectual

11 property and/or Terms of Service.

12    Even assuming for the sake of argument that Apple and Complainant engaged in more

13 extensive conversations (without Musi's involvement or knowledge), such one-sided conversations

14 would not be enough to form a "reasonable belief" that the Musi app infringed Complainant's

15 intellectual property. The ordinary and popular meaning of "reasonable belief" is one that is "in

16 accordance with reason, fairness, duty or prudence." *See Reasonable*, Merriam-Webster.com,

17 https://www.merriam-webster.com/dictionary/reasonable (last visited Oct. 4, 2023). There is nothing

18 "fair" or "prudent" about engaging in a one-sided inquiry where a company's survival is at stake. And

19 it undoubtedly contradicts Apple's "dut[ies]" under the Developer Agreement. At a minimum, Musi

20 has shown that there are serious questions as to its claim for breach of contract.

21    2.    Breach of the Implied Covenant of Good Faith and Fair Dealing

22    Musi also raises a claim for breach of the implied covenant of good faith and fair dealing. This

23 covenant is implied by law in *every* contract. *Thrifty Payless, Inc. v. The Americana at Brand, LLC*,

24 218 Cal. App. 4th 1230, 1244 (2013). Under this covenant, "no party to the contract will do anything

25 that would deprive another party" of the contract's benefits. *Miller v. Zurich Am. Ins.*, 41 Cal. App.

26 5th 247, 257 (2019) (citation omitted). Further, it "requires each party to do everything the contract

27 presupposes the party will do to accomplish the agreement's purposes." *Thrifty Payless, Inc.*, 218 Cal.

28 App. 4th at 1244. "Although a breach of the implied covenant . . . is necessarily a breach of contract,

the scope of conduct prohibited by the implied covenant often is pleaded as a separate count." *Miller*, 41 Cal. App. 5th at 257. (citation omitted). Thus, a breach of contract may also breach the implied covenant of good faith and fair dealing where the conduct involves something beyond the breach of the contractual duty itself. *See Congleton v. Nat'l Union Fire Ins.,* 189 Cal. App. 3d 51, 59 (1987).

To state a claim, Musi must allege: (1) the existence of a contractual relationship; (2) an implied duty; (3) breach; and (4) causation. *See Smith v. San Francisco*, 225 Cal. App. 3d 38, 49 (1990). Here, the way in which Apple breached the Developer Agreement separately breaches the implied covenant of good faith and fair dealing.

Implicit in its contractual obligation to conduct a "human and/or systematic review" of Claimant's claims was a duty to execute those obligations *in good faith*. After all, "[t]he covenant of good faith finds particular application in situations where one party," like Apple, "is invested with a discretionary power affecting the rights of another," like Musi. *Carma Developers (Cal.) Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992). Here, Apple did not in good faith investigate Claimant's claims. Instead, it accepted Claimant's unsubstantiated accusations at face value, and— based on that bad faith assumption—destroyed Musi's business. For these reasons, there are, at a minimum, serious questions as to whether Apple "subjectively lack[ed] belief in the validity of its acts or" whether "its conduct was objectively unreasonable." *Id.* Accordingly, Musi is separately entitled to a preliminary injunction on its claim for breach of the implied covenant of good faith and fair dealing.

* * *

This Court cannot, on today's motion, fully heal the irreparable harm incurred by Musi. But it can stop the bleeding. Most of all, it can reassure the nearly 2 million iOS developers who depend on the App Store for distribution that their rights under the Developer Agreement will be honored.

## IV.    CONCLUSION

For these reasons, Musi respectfully requests that the Court enter the proposed preliminary injunction.

Dated: October 9, 2024

Respectfully submitted,

WINSTON & STRAWN LLP

By: /s/ Jennifer A. Golinveaux
Jennifer A. Golinveaux
Jeff Wilkerson
Samantha K. Looker

Attorney for Plaintiff
MUSI INC.