1  Chris Johnstone, SBN 242152
   WILMER CUTLER PICKERING
2    HALE AND DORR LLP
   2600 El Camino Real, Suite 400
3  Palo Alto, CA 94306
   Telephone: (650) 858-6000
4  chris.johnstone@wilmerhale.com

5  Jennifer Milici (*pro hac vice*)
   WILMER CUTLER PICKERING
6    HALE AND DORR LLP
   2100 Pennsylvania Avenue, NW
7  Washington, DC 20037
   Telephone: (202) 663-6000
8  jennifer.milici@wilmerhale.com

9  Mark A. Ford (*pro hac vice*)
   WILMER CUTLER PICKERING
10   HALE AND DORR LLP
   60 State Street
11 Boston, MA 02109
   Telephone: (617) 526-6000
12 mark.ford@wilmerhale.com

13 *Attorneys for Defendant Apple Inc.*

14           UNITED STATES DISTRICT COURT

15        FOR THE NORTHERN DISTRICT OF CALIFORNIA

16              SAN JOSE DIVISION

17 MUSI INC.,                      | Case No. 5:24-cv-06920-EKL

18            Plaintiff,           | **DEFENDANT APPLE INC.'S
                                   | OPPOSITION TO MUSI INC.'S
19     v.                          | MOTION FOR A PRELIMINARY
                                   | INJUNCTION**
20 APPLE INC.,                     |

21            Defendant.           | Judge: The Honorable Eumi K. Lee
                                   | Hearing Date: January 9, 2025
22                                 | Hearing Time: 2:00 p.m.
                                   | Courtroom: 7
23

24

25

26

27

28

## TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................................................... 1

II.  STATEMENT OF FACTS ...................................................................................... 3

   A.   Musi's Agreements With Apple ................................................................... 3

   B.   The Musi App And Its Removal From App Store ......................................... 5

III. LEGAL STANDARD.............................................................................................. 9

IV.  ARGUMENT .......................................................................................................... 11

   A.   Musi Has Not Demonstrated A Likelihood Of Success Or Even Serious Questions
        On The Merits ............................................................................................. 11

        1.   The DPLA Grants Apple Complete Discretion To Remove Apps From
             App Store .......................................................................................... 12

        2.   If Required, Apple Had "Reasonable Belief" That The Musi App Violated
             Third Party Rights ............................................................................. 16

   B.   Musi Fails to Meet Its Burden On Any Of The Remaining *Winter* Elements...... 18

        1.   Musi Fails To Substantiate Irreparable Harm........................................... 18

        2.   Musi Fails To Establish That The Balance of Equities Tips In Its Favor. 21

        3.   Musi Fails To Establish That An Injunction Is In The Public Interest ..... 23

V.   CONCLUSION........................................................................................................ 24

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4

*AboveGEM, Inc. v. Organo Gold Management, Ltd.*,
   2019 WL 3859012 (N.D. Cal. Aug. 16, 2019) ................................................................19

5

6

*Bennett v. Isagenix International LLC*,
   118 F.4th 1120 (9th Cir. 2024) ......................................................................................10

7

*Caribbean Marine Services Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) .........................................................................................18

8

9

*Carma Developers (California), Inc. v. Marathon Development California, Inc.*,
   2 Cal. 4th 342 (1992) .....................................................................................................11

10

*Chastain v. Howard*,
   716 F. Supp. 3d 740 (N.D. Cal. Feb. 9, 2024) ...............................................................14

11

12

*CTIA - The Wireless Association v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019) .........................................................................................21

13

*Cutting Edge Solutions, LLC v. Sustainable Low Maintenance Grass, LLC*,
   2014 WL 5361548 (N.D. Cal. Oct. 20, 2014)................................................................21

14

15

*Doe v. Snyder*,
   28 F.4th 103 (9th Cir. 2022) ..........................................................................................10

16

*Ebeid v. Facebook, Inc.*,
   2019 WL 2059662 (N.D. Cal. May 9, 2019) ..................................................................16

17

18

*Enhanced Athlete Inc. v. Google LLC*,
   479 F. Supp. 3d 824 (N.D. Cal. 2020) ...........................................................................16

19

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ......................................................................12, 24

20

21

*Financial & Security Products Association v. Diebold, Inc.*,
   2005 WL 1629813 (N.D. Cal. July 8, 2005)...................................................................23

22

23

*Frank B. Hall & Co., Inc. v. Alexander & Alexander, Inc.*,
   974 F.2d 1020 (8th Cir. 1992) ........................................................................................24

24

25

*FTC v. EDebitPay, LLC*,
   695 F.3d 938 (9th Cir. 2012) .........................................................................................13

26

27

28

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ....................................................................10, 11

*Glow Industries, Inc. v. Lopez*,
    252 F. Supp. 2d 962 (C.D. Cal. 2002) ...............................................................21

*Herb Reed Enterprises, LLC. v. Florida Entertainment Management, Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ..........................................................................18

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) ...........................................................................20

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) ..........................................................................18

*Intango, Ltd. v. Mozilla Corp.*,
    2020 WL 12584274 (N.D. Cal. Aug. 25, 2020) ...........................................14, 15

*International Medcom, Inc. v. S.E. International, Inc.*,
    2015 WL 7753267 (N.D. Cal. Dec. 2, 2015) .......................................................19

*Keezio Group, LLC v. Mommy&Me LLC*,
    2024 WL 3432001 (N.D. Cal. July 16, 2024) ......................................................11

*Kennedy v. Meta Platforms, Inc.*,
    2024 WL 4031486 (N.D. Cal. Sep. 3, 2024) .......................................................10

*Lag Shot LLC v. Facebook, Inc.*,
    545 F. Supp. 3d 770 (N.D. Cal. 2021) ...............................................................19

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006) ......................................................................13, 14

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)...........................................................................................9

*Merced Production Credit Association v. Bayer*,
    222 Cal. App. 2d 793 (1963) .............................................................................14

*Oasis West Realty, LLC v. Goldman*,
    51 Cal. 4th 811 (2011) .....................................................................................11

*Putian Authentic Enterprise Management Co. v. Meta Platforms, Inc.*,
    2022 WL 888659 (N.D. Cal. Mar. 25, 2022).......................................................20

*Solomon v. North American Life and Casualty Insurance Co.*,
    151 F.3d 1132 (9th Cir. 1998) ..........................................................................12

*Song fi Inc. v. Google, Inc.*,
    108 F. Supp. 3d 876 (N.D. Cal. 2015) ...........................................................................16

*Southern Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*,
    860 F.3d 844 (6th Cir. 2017) .........................................................................................24

*Stackla, Inc. v. Facebook Inc.*,
    2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ...............................................................19

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .......................................................................................23

*Vellejo v. Narcos Productions LLC*,
    418 F. Supp. 3d 1084 (S.D. Fla. 2019) ..........................................................................13

*WeRide Corp. v. Kun Huang*,
    379 F. Supp. 3d 834 (N.D. Cal. 2019) ...........................................................................23

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ...........................................................................................................10

## I.     INTRODUCTION

Plaintiff Musi Inc. ("Musi") seeks a preliminary injunction that would force Apple to reinstate Musi's music streaming app (the "Musi app") to Apple's App Store notwithstanding Apple's express contractual right to remove the Musi app from App Store "at any time, with or without cause." But even if the governing contract required Apple to justify its removal of the Musi app (it does not), Apple's decision in this instance followed numerous, credible complaints alleging that the Musi app violates the legal rights of third parties. Those complaints include allegations of copyright infringement that have been widely publicized, and are specifically known to Musi, yet omitted from Musi's filings.

The Musi app provides users with an alternative interface to stream content from YouTube. In doing so, Musi allows users to engage with YouTube content in ways that YouTube and others have claimed are not authorized by the YouTube Terms of Service. Among other things, Musi removes YouTube advertising content and replaces it with Musi's own or allows ad-free streaming for a fee. Apple has received many complaints from third parties alleging that Musi reproduces copyrighted content from YouTube without authorization from the copyright holders and deprives artists and other rights holders of royalty revenue. In July 2023, the International Federation of the Phonographic Industry ("IFPI") submitted such a complaint on behalf of its members, alleging that Musi violates YouTube's Terms of Service and infringes its members' copyrights. Musi engaged with IFPI and Apple but failed to resolve IFPI's concerns. On at least six separate occasions between September 2023 and May 2024, IFPI demanded that Apple remove the Musi app due to copyright violations. IFPI copied Musi on those demands. IFPI member Sony Music Entertainment ("SME") likewise submitted a similar complaint against the Musi app in July 2023, which also included allegations of copyright infringement, was also shared with Musi, and also went unresolved.

In July 2024, YouTube submitted a complaint to Apple alleging that the Musi app violates YouTube's Terms of Service and requested that Apple remove the Musi app from App Store. Musi admits that YouTube repeatedly raised concerns about the Musi app's use of YouTube content and

compliance with YouTube's Terms of Service over a multi-year period.  Musi nevertheless argues that YouTube refused to engage with it to resolve the dispute, but the evidence it submits to this Court does not contain any substantive communication from Musi to YouTube, does not contain any offer by Musi to change its app to resolve the dispute, and does not reference any attempt by Musi to adjudicate its dispute with YouTube in an appropriate forum.

In September 2024, the National Music Publishers' Association ("NMPA") submitted a letter in support of YouTube's complaint.  NMPA asserted:  "Musi is an audio streaming app that leeches its content offerings from YouTube's Application Programming Interface ('API') to avoid paying copyright licensing fees."  Declaration of Violet Evan-Karimian in Support of Apple's Opposition to Motion for Preliminary Injunction ("Evan-Karimian Decl.") Ex. 6 at 1.  NMPA submitted evidence in support of its contention that Musi violates YouTube's Terms of Service, including snippets of Musi's code.  NMPA also requested "that the app be expeditiously removed from the Apple App Store."  *Id.* at 2.  On September 24, 2024, Apple removed the Musi app from App Store.

Musi now argues that Apple's decision to remove its app was supported only by a "five word complaint" from YouTube.  That is false, and Musi knows that it is false.  But even if it were true, Musi's claim and motion would still fail.  Apple is contractually permitted to remove the Musi app for any reason, including receipt of YouTube's so-called "five word complaint," and that contractual right is not limited in any way.  Apple takes no position on the dispute between Musi and YouTube, nor between Musi and the many other non-parties that have complained about the Musi app.  Similarly, in ruling on Musi's motion, this Court need not (and, respectfully, should not) resolve the underlying disputes between Musi and those non-parties.  What matters here is that, under the terms of the parties' contract, Apple expressly retains the right to remove apps, including the Musi app, from App Store, with or without cause.

Musi comes nowhere close to establishing any likelihood of success on the merits of its contract claims.  Black letter law makes clear that conduct expressly permitted by a contract cannot support a claim for breach of that contract or of the implied covenant of good faith and fair dealing.

Musi, therefore, is not entitled to the extraordinary remedy it seeks, and the Court should not force Apple to distribute Musi's app before a decision on the merits of Musi's claims.

Musi's motion also fails for the independent reason that Musi has not substantiated its claim that maintaining the status quo temporarily while the merits are litigated "risks Musi's extinction" or otherwise causes irreparable harm. Musi asserts that its app is still in use by its pre-existing customer base, and so Musi is presumably still earning revenue from ads. Moreover, Musi provides no evidence relating to its financial condition and no evidence that it is unable to survive until a decision on the merits in this case. In fact, public reporting suggests that Musi earned more than $100 million in advertising revenue between January 2023 and spring 2024 and employs ten people at most. If true (and Musi provides no evidence that it is not), Musi is not at imminent risk of extinction. On the other hand, Musi's argument that "Apple … faces little risk or harm" if an injunction is granted strains belief. Forcing Apple to distribute an app reportedly downloaded by millions of people and that allegedly implicates the rights of numerous non-parties would subject Apple to legal risks that it should not be compelled to bear. And if the Court accepts Musi's theory as to Apple's contractual obligations, a ruling in Musi's favor would essentially force Apple to adjudicate the merits of every allegation of infringement made against an app developer. Apple receives thousands of third-party complaints each year, and adjudicating each of those complaints would be unmanageable and would subject Apple to legal challenges from both developers and complainants for the business decisions it makes in the face of infringement complaints. Moreover, the public interest in the preservation of intellectual property rights weighs heavily against the injunction sought here, which would force Apple to distribute an app over the repeated and consistent objections of non-parties who allege their rights are infringed by the app.

The Court should deny Musi's motion.

## II.    STATEMENT OF FACTS

### A.  Musi's Agreements With Apple

Musi concedes that it agreed to the terms of the Apple Developer Program License Agreement ("DPLA"). *See* Compl. ¶ 19; Br. at 2-3. The DPLA explicitly provides Apple with

the discretionary right to delist third-party apps for download on App Store, including under § 6.3 of the DPLA, Schedule 1 (for free apps); § 7.3 of the DPLA, Schedule 2 (for paid apps); and § 7.3 of the DPLA, Schedule 3 (for paid apps distributed through Custom App Distribution).  Each of these provisions states that "Apple reserves the right to cease marketing, offering, and allowing download" of covered apps "*at any time, with or without cause*, by providing notice of termination to You."  Declaration of Jennifer A. Golinveaux in Support of Musi's Motion for Preliminary Injunction ("Golinveaux Decl.") Ex. A at 84 (DPLA, Schedule 1 § 6.3); *id.* Ex. B at 11 (DPLA, Schedule 2 § 7.3), 20 (DPLA, Schedule 3 § 7.3) (emphasis added).  The DPLA, Schedule 1 goes on to state:

> ***Without limiting the generality of this Section 6.3***, You acknowledge that Apple may cease allowing download by end-users of some or all of the Licensed Applications, or take other interim measures in Apple's sole discretion, if Apple reasonably believes, based on human and/or systematic review, and, including without limitation upon notice received under applicable laws, that: … (ii) those Licensed Applications and/or any end-user's possession and/or use of those Licensed Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party[.]

*Id.* Ex. A at 84 (DPLA, Schedule 1 § 6.3) (emphasis added).  Both § 7.3 of the DPLA, Schedule 2 and § 7.3 of the DPLA, Schedule 3 include substantively similar provisions, though Schedules 2 and 3 also empower Apple to cease "the marketing" of covered apps, and "allowing download by End-Users" of covered apps.  *Id.* Ex. B at 11, 20 (DPLA, Schedule 2 § 7.3; DPLA, Schedule 3 § 7.3).

As a third-party app developer, Musi is also subject to the Apple Developer Agreement ("ADA"), which provides that:

> Apple may terminate or suspend you as a registered Apple Developer at any time in Apple's sole discretion.  If Apple terminates you as a registered Apple Developer, Apple reserves the right to deny your reapplication at any time in Apple's sole discretion. … Upon any termination or, at Apple's discretion, suspension, all rights and licenses granted to you by Apple will cease[.]

Declaration of Jennifer Milici in Support of Apple's Opposition to Motion for Preliminary Injunction ("Milici Decl.") Ex. 1 at 4 (ADA ¶ 10).

### B. The Musi App And Its Removal From App Store

The Musi app streams audio and video content from YouTube. Evan-Karimian Decl. Ex. 6 at 1. Relying on YouTube's Application Programming Interface ("API"), the app allows users to watch videos and listen to audio from YouTube without any associated YouTube advertising content. *Id. See also* Evan-Karimian Decl. ¶ 7. Instead, users are presented with Musi's own advertisements, or can opt to pay a one-time fee for ad-free streaming. *Id.* Ex. 6 at 1.

According to public reporting, the Musi app was downloaded 8.5 million times in 2023. *See* Milici Decl. Ex. 2 at 2; *see also* Declaration of Aaron Wojnowski in Support of Musi's Motion for Preliminary Injunction ("Wojnowski Decl.") ¶ 9 (noting Musi's "massive user base"). Although Musi provides the Court no information regarding its finances or staffing, according to published reports, Musi earned $107 million in advertising revenue alone between January 2023 and May 2024. Milici Decl. Ex. 2 at 6. According to the company's LinkedIn page, Musi has, at most, ten employees. *Id.* Ex. 3 at 1. *See also* Wojnowski Decl. ¶ 4 (noting that Musi "operate[s] … with a small team headquartered in Manitoba").

Musi acknowledges that YouTube itself has raised various concerns about the Musi app, *see* Br. at 5-6, and alleges that Musi and YouTube have had multiple communications about those concerns. In fact, in its motion, Musi reveals that outside counsel for the two companies interacted about YouTube's concerns in 2021. *Id.* at 5; Declaration of Michael S. Elkin in Support of Musi's Motion for Preliminary Injunction ("Elkin Decl.") ¶ 2. Musi briefly references those communications but did not submit them for review by this Court.

Since the Musi app was first published on App Store, Apple has received more than a dozen third-party complaints regarding the app's functionality, including complaints from record labels and trade organizations within the music industry alleging that the app infringes the intellectual property rights of these organizations and their members. Evan-Karimian Decl. ¶ 3. For example, Apple received complaints from, among others, Universal Music Group and SME. *Id.* Each of these complaints was provided to Musi, as Apple's standard practice for resolving third-party

disputes is to "contact the provider of the disputed content regarding [the] claim and ask that they work with [the claimant] directly to resolve the issue." Milici Decl. Ex. 4 at 1.

In July 2023, IFPI—a worldwide organization representing the recording industry—submitted a complaint to Apple alleging that the Musi app engages in the unauthorized distribution of the copyrighted works of IFPI members ("IFPI Member Content"). Evan-Karimian Decl. ¶ 4. IFPI asserted that the Musi app circumvents YouTube's technological protection measures ("TPMs") to allow users to engage with IFPI Member Content in ways not authorized under YouTube's licensing agreements—including allowing for "background listening" (i.e., streaming YouTube audio content from a mobile device while the device is locked) and allowing for "non-video playback" (i.e., streaming YouTube audio content without the associated visual content). *Id.* Ex. 1 at 1, 6. Musi, through its counsel (Winston & Strawn LLP), responded to these complaints by asserting that it does not violate YouTube's Terms of Service. *Id.* at 3. IFPI disagreed and has repeatedly demanded that Apple remove Musi's app because, according to IFPI, the app infringes IFPI members' copyrights. *Id.* at 1, 6-7, 10-11, 17-18, 23, 29, 38. On April 15, 2024, IFPI reiterated its objections to Apple (copying counsel for Musi), and asserted:

> In light of this explanation and our continued correspondence with you regarding this app more generally, please note that we consider that Apple has the requisite knowledge of this illegal activity as referred to in Article 6 of the EU Digital Services Act. Therefore, for all these reasons please keep this complaint open and we reiterate our request that the app be removed from the App Store without further delay.
>
> In the meantime, all rights and remedies of IFPI and its members and their represented artists are reserved in full.

*Id.* at 7. Following a response from Winston & Strawn, Apple reiterated that "Apple cannot serve as arbiter for disputes among third parties," directed Musi to continue to work with IFPI on the issue, and stated that Apple "look[ed] forward to confirmation from both parties that this issue has been resolved." *Id.* at 2. IFPI responded that Musi had not resolved IFPI's objections, provided Apple with a copy of a letter sent to Musi's UK solicitors, reiterated its grounds for believing "the

Musi app is infringing [IFPI] members' rights," and urged Apple: "[W]ill you now please remove the Musi App from App Store without any further delay." *Id.* at 1.

SME, which is a member of IFPI, also submitted a complaint against the Musi app in July 2023 which included similar allegations that the Musi app was infringing SME copyrights. Evan-Karimian Decl. ¶ 6. This complaint, like the July 2023 IFPI complaint, also went unresolved. In April 2024, a representative from SME reached out to Apple to follow up on the status of that complaint. *Id.* As part of that outreach, SME stated its belief—similar to IFPI's—that Musi sourced SME content by circumventing YouTube's TPMs. *Id.*

The music industry's complaints about the Musi app have also received significant public attention. For example, a *Wired* article published in May 2024 states that the "legality" of Musi is "being questioned by record labels and music industry groups … over whether it has the rights to distribute and monetize the music users stream on its platform." Milici Decl. Ex. 2 at 3. A separate article published in July 2024 notes that the app "operat[es] in a 'gray area,'" and highlights the complaint submitted to Apple by "global music industry body IFPI." *Id.* Ex. 5 at 3.

On July 29, 2024, YouTube contacted Apple to reiterate its position from a prior complaint that Musi was violating YouTube's Terms of Service. Evan-Karimian Decl. ¶ 8. YouTube's July 29, 2024 email came after a phone call between Apple and YouTube on July 15, 2024, during which YouTube asserted that Musi's use of YouTube's API to stream content from YouTube violated the platform's Terms of Service. *Id.* ¶ 7. YouTube requested that Apple remove the Musi app from App Store. *Id.* Apple notified Musi of YouTube's complaint on August 8, 2024, informing Musi that failure to resolve the complaint directly with YouTube could result in removal of the Musi app from App Store. Elkin Decl. Ex. A.

On September 11, 2024, the National Music Publishers Association ("NMPA")—a trade organization representing American music publishers and songwriters—submitted a letter to Apple in support of YouTube's July 2024 complaint and providing what NMPA described as "important evidence concerning Musi's abuse of YouTube's policies." Evan-Karimian Decl. Ex. 6 at 1. NMPA, like the other complaining entities, outlined concerns that Musi "leeches its content

offerings from YouTube's [API] to avoid paying copyright licensing fees," and explained that Musi's "ad manipulation serves to undermine NMPA members' various YouTube licensing structures," such that Musi "diverts royalties from music publishers and songwriters to itself." *Id.* at 1-2.  As an attachment to its letter, NMPA provided "NMPA's own research into Musi's technical workings," which, NMPA asserted, purportedly "confirms that Musi is indeed in violation of YouTube's Developer Policies." *Id.* at 2.  The attachment to the NMPA letter provides what NMPA describes as snippets of the code underlying the Musi app as well as the network requests that occur when YouTube content is played through the Musi app.  *Id.* at 4-5.  NMPA argued that this evidence reflects that (1) "Musi uses YouTube's API to pull in tracks/videos," *id.* at 4, and (2) "Musi lays its own ads over YouTube's ads" using third-party advertising services, including services for advertising analytics and revenue collection, *id.* at 4-5.  The NMPA letter also cites to YouTube's Developer Policies, which state, among other prohibitions, that developers may not "sell advertising … on any page or screen that contains YouTube API Data unless other data, content, or material not obtained from YouTube appears on the same page and offers enough independent value to justify such sales if the YouTube API Data were removed," and further, that developers may not "modify, interfere with, replace, or block advertisements placed or served by YouTube."  Milici Decl. Ex. 6 at 23, 25.

On September 18, 2024, following the NMPA letter; the outreach from SME; and IFPI's repeated requests that Apple remove the app, and upon confirming with YouTube that its dispute with Musi had not been resolved, Apple notified Musi that "[i]f the matter is not resolved shortly, Apple may be forced to pull your application(s) from the App Store."  Elkin Decl. Ex. D at 2-3. Counsel for Musi responded on September 19, 2024, stating that they had been in communication with YouTube Legal—without confirmation that the matter had been resolved—and "acknowledg[ing] that Apple does not act as arbiter for disputes amongst third parties."  *Id.* at 2. The September 19 response directly contradicts a September 6, 2024 message from YouTube to Apple, which states that "Musi has not reached out to us … and this app continues to violate our Terms of Service."  Elkin Decl. Ex. C at 2.  While Musi's counsel responded in a separate

September 6, 2024 message that he "did not receive a response to my last substantive communication [with YouTube], which detailed how Musi's service works and why it is fully in compliance with YouTube's terms in response to YouTube's questions," *id*. at 1, the only such substantive communication identified by Musi in its motion papers appears to have occurred in April 2021, Elkin Decl. ¶ 2, over three years prior to YouTube's July 2024 complaint. Musi did not submit the 2021 communications to the Court.

In sum, in 2024 alone, SME, IFPI, NMPA, and YouTube each alleged that the Musi app violates YouTube's Terms of Service. IFPI and NMPA submitted evidence in support of those allegations and alleged that their members were harmed by Musi's copyright violations. Musi responded to complaints by denying that it violates YouTube's Terms of Service. But Apple repeatedly reiterated, and Musi acknowledged, that Apple does not adjudicate disputes amongst third parties. Apple also repeatedly informed Musi that its app would be removed if it failed to resolve its dispute with YouTube.

On September 24, 2024, Apple removed the Musi app from App Store. At the time of removal, Apple explained to Musi that "Apple informed you of the claim, and of your responsibility to resolve the matter directly with the Claimant, or risk removal of your App from the App Store." Elkin Decl. Ex. E. On October 2, 2024, rather than resolving the matter with YouTube through negotiation or litigation, Musi sued Apple for breach of contract and breach of the implied covenant of good faith and fair dealing. Dkt. 1. Musi then moved for a preliminary injunction requiring Apple to reinstate the Musi app on App Store. Dkt. 10.

## III.    LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

1    tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council,*

2    *Inc.*, 555 U.S. 7, 20 (2008).  The Ninth Circuit has "adopted a sliding-scale approach to the *Winter*

3    factors, stating that serious questions going to the merits and a hardship balance that tips sharply

4    toward the plaintiff can support issuance of an injunction, assuming the other two elements of the

5    *Winter* test are also met."  *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1126 (9th Cir. 2024)

6    (internal quotations, citations, and emphasis omitted).  However, "if a movant fails to meet the

7    threshold inquiry of likelihood of success on the merits (or serious questions going to them), a

8    court may decide to deny a preliminary injunction without considering the other factors."  *Id.*

9    Musi seeks a mandatory injunction because it asks the Court to force Apple to distribute

10    its app through App Store.  A "mandatory injunction … goes beyond simply maintaining the status

11    quo and orders the responsible party to take action pending the determination of the case on its

12    merits."  *Doe v. Snyder*, 28 F.4th at 103, 111 (9th Cir. 2022).  A movant's burden is "doubly

13    demanding" in seeking a mandatory injunction—the movant "must establish that the law and facts

14    *clearly favor* [its] position, not simply that [it] is likely to succeed."  *Garcia v. Google, Inc.*, 786

15    F.3d 733, 740 (9th Cir. 2015); *see also Snyder*, 28 F.4th at 108 (even where the movant presents

16    "extreme or very serious damage … not compensable in damages," the request may only be

17    granted if "the merits of the case [a]re not doubtful").  In an apparent effort to avoid the mandatory

18    injunction standard, Musi's motion requests "a preliminary injunction to *restrain* Defendant Apple

19    Inc. from *refusing* to list or otherwise *making unavailable*," the Musi app.  Br. at i (emphases

20    added).  But Musi's wordsmithing does not change the fact that its motion requests an order forcing

21    Apple to "take affirmative action" by reinstating the Musi app, which would change the status quo.

22    *See Garcia*, 786 F.3d at 740; *see also Kennedy v. Meta Platforms, Inc.*, 2024 WL 4031486, at *15

23    (N.D. Cal. Sep. 3, 2024) (explaining that plaintiffs "frame this as a prohibitory injunction to stop

24    censorship, but it seems to be a mandatory injunction to order the defendants to publish the

25    plaintiffs' posts, videos, speech, and other content").  While the mandatory injunction standard is

26    appropriate here, as set forth below, Musi has failed to satisfy its burden even under the more

27    lenient prohibitory injunction standard, and its motion should be denied.

28

1

## IV.    ARGUMENT

2    Musi fails to meet its burden under any prong of the preliminary injunction standard.  Its

3    merits arguments fail because the parties' agreements expressly grant Apple discretion to remove

4    apps from App Store.  This fundamental and incurable deficiency in Musi's claims precludes

5    injunctive relief.  *See Garcia*, 786 F.3d at 740 ("[W]hen a plaintiff has failed to show the likelihood

6    of success on the merits, we need not consider the remaining three *Winter* elements." (internal

7    quotations omitted)); *see also Keezio Grp., LLC v. Mommy&Me LLC*, 2024 WL 3432001, at *4

8    (N.D. Cal. July 16, 2024) ("Because [plaintiff] has not met its burden of demonstrating likelihood

9    of success on the merits or even serious questions going to the merits, it is unnecessary for the

10   Court to consider the remainder of the *Winter* factors.").

11   In addition to failing to demonstrate that its contract claims are likely to succeed, Musi fails

12   to demonstrate that it needs the extraordinary relief it seeks while the claims are litigated.  Musi

13   provides no information about its financial condition at all, and cannot establish that it will suffer

14   irreparable injury during the litigation.  Moreover, Musi fails to properly balance the equities, and

15   incorrectly assumes that forcing Apple to distribute Musi's app despite repeated complaints from

16   third parties that allege infringement of their rights poses no harm to Apple.  Finally, it is not in

17   the public interest to force Apple to distribute the Musi app over the objections of multiple non-

18   parties, who are not before the Court, and who allege that the app infringes their legal rights.

19   ### A.    Musi Has Not Demonstrated A Likelihood Of Success Or Even Serious
            Questions On The Merits

20

21   Musi's claims against Apple fail because the conduct at issue—Apple's decision to remove

22   the Musi app from App Store—is expressly permitted by the parties' contracts.  Under controlling

23   California law, conduct that is expressly permitted cannot form the basis of either a breach of

24   contract claim or a claim for a breach of the covenant of good faith and fair dealing.  *See, e.g.*,

25   *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (requiring showing of breach);

26   *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 376 (1992) (holding

27   that conduct that "was expressly permitted by the [contract] and was clearly within the parties'

28

reasonable expectations …. can never violate an implied covenant of good faith and fair dealing");
*see also Solomon v. North Am. Life and Cas. Ins. Co.*, 151 F.3d 1132, 1137 (9th Cir. 1998) ("[A]
party cannot be held liable on a bad faith claim for doing what is expressly permitted in the
agreement.").    To avoid this common-sense result, Musi contorts the plain language of the
governing provisions beyond recognition.  In doing so, Musi cites cases that not only fail to support
Musi's position, but directly contradict it.

### 1.    The DPLA Grants Apple Complete Discretion To Remove Apps From App Store

The very DPLA provisions on which Musi relies give Apple the sole and complete
discretion to remove apps from App Store.  Each provision provides that "Apple reserves the right
to cease marketing, offering, and allowing" downloads or purchases of the developer's application
"at any time, ***with or without cause***, by providing notice of termination."  Golinveaux Decl. Ex.
A at 84 (DPLA, Schedule 1 § 6.3); *id.* Ex. B at 11 (DPLA, Schedule 2 § 7.3), 20 (DPLA, Schedule
3 § 7.3) (emphasis added).  Reserving this right is fundamental to Apple's management of App
Store.  As courts have acknowledged, Apple's ability to curate which apps are available on App
Store directly benefits both consumers and developers because it "provides a safe and trusted user
experience on iOS, which encourages both users and developers to transact freely and is mutually
beneficial."  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1038 (N.D. Cal. 2021).  Musi's
claims fail based on this language alone.

Musi ignores the operative first sentence of each of these provisions and focuses instead
on the language that comes after.  Specifically, following the clear, unambiguous grant of
discretion to Apple, each provision states that—"***[w]ithout limiting the generality***" of rights
granted in the section—the developer "acknowledge[s] that Apple may cease allowing download"
of apps "in Apple's sole discretion, if Apple reasonably believes, based on human and/or
systematic review, and, including without limitation upon notice received under applicable laws,"
that the applications "infringe … intellectual property rights of any third party."  Golinveaux Decl.
Ex. A at 84 (DPLA, Schedule 1 § 6.3); *id.* Ex. B at 11 (DPLA, Schedule 2 § 7.3), 20 (DPLA,

Schedule 3 § 7.3) (emphasis added). Musi reads this acknowledgement to *limit* the express right granted to Apple in the preceding sentence to act in its sole discretion. Br. at 15 (arguing that Apple may terminate an app for suspected intellectual property violations *only* if it demonstrates "reasonable belief" following "human and/or systematic" review). Musi's argument is contrary to the plain meaning of the phrase "without limiting" and contrary to basic rules of contract interpretation. The phrase "*without limiting* the generality of the foregoing" introduces terms that expand or elaborate, not terms that limit. *See Vellejo v. Narcos Productions LLC*, 418 F. Supp. 3d 1084, 1089 (S.D. Fla. 2019) ("Plaintiff argues that this clarification is a limitation, but the language at the start of the very sentence setting out the movie rights says, 'without limiting the generality of the foregoing' … Under California law, this language indicates that the rights assigned are broader than the enumerated rights that follow."); *see also FTC v. EDebitPay, LLC*, 695 F.3d 938, 943 (9th Cir. 2012) ("'[I]ncluding but not limited to' language 'is a phrase of enlargement.' It indicates an intention that enumerated examples following the phrase should not be construed as an exhaustive listing." (quoting *In re Johnny M.*, 100 Cal. App. 4th 1128, 1135 (2002))).

Musi claims that courts "have consistently *effectuated* statutory and/or contractual language proceeding [sic] similar phrasing," Br. at 16 (emphasis added). While difficult to discern, Musi apparently argues that courts recognize that parties have agreed to the terms that follow phrases like "without limiting the foregoing." But the issue is not whether Musi's "acknowledgement" of those terms is "effective" (it is); rather, the issue is whether the specific acknowledgement *limits* the right granted to Apple before it (it does not). In fact, Musi's lead case—*Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006)—illustrates that critical distinction.

*Marder* involved a contractual provision that began with a broad release of "each and every claim" arising from "any matters." 450 F.3d at 449. "Without limiting the generality of the foregoing Release," the provision also released "each and every claim" arising from the plaintiff's contributions to the movie "Flashdance." *Id.* at 454. This latter sentence encompassed "any and all arrangements (including but not limited to research, interviews, costumes, photographic sessions, assistance, services and technical advice of any kind)." *Id.* Musi observes that the Ninth

Circuit gave "effect" to the latter language in finding that the claim asserted was covered by the release for "any and all arrangements."  Br. at 16.  But that does not help Musi because the Ninth Circuit also held that even if the plaintiff's claim was "not covered by 'arrangements,' the instant claim would be precluded by the release relating to 'any matters.'"  In other words, the Ninth Circuit in *Marder* expressly declined to read language following the phrase "*[w]ithout limiting the generality of the foregoing*" as limiting the defendants' contractual rights.  *See* 450 F.3d. at 451-52 (emphasis in original).

Not surprisingly, *none* of Musi's cited cases read language following the phrase "without limiting the generality of the foregoing" to limit the language that came before it.  *Chastain v. Howard*, 716 F. Supp. 3d 740, 744, 746-47 (N.D. Cal. 2024), Br. at 16, involved a release that covered "any and all … claim[s]" that either party had against each other *at the time of* the release and then, "without limiting the generality of the foregoing," specifically released claims under the California Family Code, "known or unknown," which arose before or *after the release*.  By holding that the latter release, for claims post-dating the agreement, was not applicable, the court in *Chastain* did not in any way limit the scope of the broad release applicable to existing claims.  In fact, the defendant in *Chastain* had only relied on the latter release regarding "known or unknown" claims for its unsuccessful waiver argument.  *See Chastain v. Howard*, No. 22-cv-06747-PCP (N.D. Cal.), Dkt. 24 (Motion to Dismiss) at 2, 6.  *See also Merced Prod. Credit Ass'n v. Bayer*, 222 Cal. App. 2d 793, 799-800 (1963) (Br. at 16) (applying statutory language providing for a mortgagee's lien over subsequently acquired livestock, without limiting the generality of the preceding provision requiring that sale contracts of covered livestock be properly recorded).

Judge Cousins's decision in *Intango, Ltd. v. Mozilla Corp.*, 2020 WL 12584274 (N.D. Cal. Aug. 25, 2020), cited by Musi, is instructive.  Judge Cousins addressed a termination provision (similar to the provisions at issue in this case) that (1) expressly provided, in the first sentence, that Mozilla reserved the right "in [its] sole discretion" to remove or revoke add-ons to its software, and (2) which proceeded, in the second sentence, to state that Mozilla's right "applies, *but is not limited to*, Add-ons that, in [Mozilla's] reasonable opinion, violate [the parties'] Agreement or the

law, [or] any applicable Mozilla policy." *Id.* at *6.  Musi wrongly claims that Judge Cousins dismissed the complaint only after implicitly concluding that Mozilla possessed a reasonable belief that the plaintiff had violated policies.  Br. at 17.  But, in fact, Judge Cousins expressly rejected the proposition that the second sentence limited the broad discretion to terminate that Mozilla reserved in the first sentence:

> [U]nder the Distribution Agreement, Mozilla may "remove or revoke access to any Listed or Unlisted Add-ons." *See* § 7.  That right "is not limited to" situations where Mozilla found that the add-on violates Mozilla policy.  *Id.*  Thus, Intango's contention that Mozilla unreasonably found that its add-ons violated Mozilla policy or that the removal was conducted in bad faith is beside the point. The Distribution Agreement simply permits Mozilla to remove Intango's add-ons "at any time." *Id.* ... [T]he express terms of the Distribution Agreement permit Mozilla to remove Intango's add-ons even if Mozilla's asserted reason for removal was pretextual.  A contrary result would impermissibly impose substantive limits on Mozilla expressly disclaimed by the parties' agreement.

*Intango*, 2020 WL 12584274, at *7.  The same reasoning applies here.

Indeed, interpreting the DPLA provisions to circumscribe Apple's broad discretion to remove apps "with or without cause" makes no sense in the context of the parties' overall contractual relationship.  The ADA, which also governs Apple's relationship with registered developers, provides—without any limiting language whatsoever—that "Apple may terminate or suspend ... a registered Apple Developer at any time in Apple's sole discretion" and that "[u]pon any termination or, at Apple's discretion, suspension, all rights and licenses granted ... by Apple will cease."  Milici Decl. Ex. 1 at 4 (ADA ¶ 10).   While Apple has not terminated or suspended Musi's developer account, this provision renders Musi's tortured construction of the cited DPLA provisions illogical because it implies that Apple was limited in its discretion to remove the Musi app but had full discretion to terminate Musi's developer account entirely (and the Musi app along with it).

Thus, as in *Intango*, whether Apple had a "reasonable belief" that Musi violated the legal rights of third parties is "beside the point." *Intango,* 2020 WL 12584274, at *6.  Apple reserved the sole discretion to remove the Musi app "with or without cause."  Like *Intango*, that sole discretion is fatal to Musi's contract claim and its claim for breach of the implied covenant of good

faith and fair dealing.  Apple had no obligation to further engage with Musi before removing its app.  *See, e.g.*, *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 884-85 (N.D. Cal. 2015) (dismissing plaintiff's breach of contract and implied covenant claims with prejudice where the YouTube Terms of Service authorized YouTube "to relocate or remove videos in its sole discretion" and to "discontinue any aspect of the Service at any time"); *Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *8 (N.D. Cal. May 9, 2019) (rejecting plaintiff's argument that Facebook "failed to exercise its contractual right to remove or disprove any post in good faith" where "plaintiff [] conceded that Facebook had the contractual right to remove or disapprove any post or ad at Facebook's sole discretion"); *Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824, 833 (N.D. Cal. 2020) (dismissing implied covenant claim where Google had "sole discretion" to determine whether plaintiff's videos "violated the Terms of Use and Community Guidelines, and to 'discontinue' service 'at any time,'" and noting that whether plaintiff "disagreed with [Google's] reasoning, or lost revenue as a result, is simply inapposite").

### 2. If Required, Apple Had "Reasonable Belief" That The Musi App Violated Third Party Rights

Even if Musi's claims did turn on whether Apple had a "reasonable belief" within the meaning of the DPLA (and they do not), Musi's claims would still fail.

Putting aside the multiple complaints Apple received about the Musi app reaching back to 2015, in 2023 and 2024 alone Apple received complaints not only from YouTube itself (including during a July 15, 2024 phone conversation between YouTube and Apple, *see supra* § II.B.), but also from multiple record labels and organizations representing the interests of record labels and musicians, urging Apple to remove the Musi app because, they argued, the app infringed copyrights and improperly siphoned off royalty revenues to which record companies and artists were entitled through YouTube distribution.  Musi's contention that Apple removed its app based solely on "a five word complaint" from YouTube is, as detailed above, demonstrably false.

Musi participated in at least ten months of communication with IFPI and Apple concerning IFPI's allegations that Musi violates YouTube's Terms of Service and infringes the copyrights of

1   IFPI's members.  Evan-Karimian Decl. Ex. 1.  And following SME's outreach to Apple in April

2   2024 and IFPI's repeated demands that Apple remove the Musi app, YouTube renewed its own

3   complaint to Apple.  *Id.* ¶¶ 7-8.  Then, on September 11, 2024, Apple received a letter from NMPA,

4   which alleged that "[b]y removing YouTube's native advertisements in favor of its own, Musi

5   violates YouTube's developer Agreement—as defined in Section 2 of YouTube's API Services

6   Terms of Service."  *Id.* Ex. 6 at 1.  The NMPA letter further claimed that "Musi is an audio

7   streaming app that leeches its content offerings from YouTube's [API] to avoid paying copyright

8   licensing fees," and engages in "ad manipulation … to undermine NMPA members' various

9   YouTube licensing structures."  *Id.*  NMPA also attached its "own research into Musi's technical

10  workings" in "furtherance of YouTube's complaint" against Musi, which it argued would be

11  "highly relevant to Apple's review of YouTube's complaint," and "hope[d] that Apple will act

12  swiftly to avoid further harm."  *Id.* at 2.

13          Thus, before removing Musi's app, Apple received and reviewed correspondence from

14  multiple industry organizations and communicated directly with YouTube and others amid a

15  backdrop of public reporting questioning the legality of Musi's business model.  *See* Milici Decl.

16  Exs. 2, 5.  Musi's argument that Apple was required to conduct some unspecified other "human or

17  systematic review" is without merit.  Apple's consideration of information provided by and

18  communications with third parties (and information available in the press) is entirely proper under

19  the broad discretion provided by the parties' agreements.  Indeed, the same DPLA provisions cited

20  by Musi make clear that Apple may remove an app based upon an infringement notice received

21  from a third party.  Golinveaux Decl. Ex. A at 84 (DPLA, Schedule 1 § 6.3); *id.* Ex. B at 11 (DPLA,

22  Schedule 2 § 7.3), 20 (DPLA, Schedule 3 § 7.3).

23          Musi's claim thus fails multiple times over—Apple has the sole discretion to remove

24  Musi's app for any reason, and Apple had ample grounds to form a reasonable belief that Musi's

25  app potentially infringes third party rights.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.  Musi Fails to Meet Its Burden On Any Of The Remaining *Winter* Elements

Because Musi has failed to establish a likelihood of success on the merits (or any serious question as to the merits), the Court's analysis can stop here.   But even setting aside the fundamental problems with the merits of Musi's claims, Musi's motion would fail under the remaining *Winter* elements.   Musi has submitted no evidence demonstrating that it will suffer irreparable harm while its claims are litigated on the merits.   Moreover, Musi ignores the harm to Apple that would flow from an injunction, as well as the potential harm to third parties properly considered under the public interest element.   Musi cannot carry its burden under *any* of the four *Winter* elements, and its motion should be denied.

### 1.  Musi Fails To Substantiate Irreparable Harm

"A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original). "Speculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).  Nor can a plaintiff satisfy this element with unsupported assertions.  *See Herb Reed Enters., LLC. v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (reversing grant of preliminary injunction because "the district court abused its discretion by relying on 'unsupported and conclusory statements regarding harm [the plaintiff] *might* suffer.'" (emphasis in original)).

Here, the only evidence Musi cites to support its claim that it will suffer irreparable harm while the merits are litigated is a three-page declaration from Aaron Wojnowski, its co-founder and CEO.  Mr. Wojnowski declares that "[u]nless the Musi app is re-listed, Musi will be forced to terminate its staff and shut its doors."  Wojnowski Decl. ¶ 9.  Mr. Wojnowski does not provide any factual basis for that contention and nowhere states that Musi would be forced to "shut its doors" imminently, while this litigation is pending.  The declaration says nothing about Musi's financial condition, the revenue it is currently generating, or when Musi would supposedly be

1    "forced" to terminate its staff.  Contrasting Musi's unsubstantiated claims, public reporting

2    suggests that Musi has generated over $100 million in advertising revenue between January 2023

3    and Spring 2024.  Milici Decl. Ex. 2 at 6.  And Musi has offered no reason to believe it is not still

4    generating substantial advertising revenue, as the Musi app apparently remains available to its

5    existing "massive user base." *See* Br. at 11; Wojnowski Decl. ¶ 9.  *See also* Milici Decl. Ex. 2 at

6    2 (noting that the Musi app had approximately 8.5 million downloads in 2023).  Musi's own

7    LinkedIn profile also reflects that the company employs, at most, ten people.  *Id.* Ex. 3 at 1; *see*

8    *also* Wojnowski Decl. ¶ 4 (noting that Musi is operated by "a small team").  In light of such

9    evidence (which Musi either corroborates or provides no evidence to contradict), and with only a

10   speculative and conclusory declaration to support its claims, Musi has not established that the

11   temporary inability to "update[e] its app and acquir[e] new users" during the pendency of the

12   litigation will force it to shutter its business entirely.  *Id.* ¶ 8.

13          While the threat of being driven out of business may sometimes be sufficient to establish

14   irreparable harm, the movant must substantiate that risk to prevail.  *Lag Shot LLC v. Facebook,*

15   *Inc.*, 545 F. Supp. 3d 770, 787 (N.D. Cal. 2021) ("Although the threat of being driven out of

16   business may establish irreparable harm …. mere assertions that a plaintiff 'may' go out of

17   business are insufficient.").  Courts routinely deny requests for injunctive relief where, as here, the

18   requests are supported by conclusory declarations without any underlying financial information.

19   For example, in *Stackla, Inc. v. Facebook Inc.*, Judge Hamilton denied an injunction, holding that

20   a CEO's declaration that the plaintiffs would "soon reach a tipping point where [they] can no

21   longer operate" was "inherently speculative" because the plaintiffs failed to "offer any indication

22   about their financial strength or the likelihood that they will dissolve as going concerns at any

23   particular point in time."  2019 WL 4738288, at *5 (N.D. Cal. Sept. 27, 2019).  *See also*

24   *AboveGEM, Inc. v. Organo Gold Mgmt., Ltd.*, 2019 WL 3859012, at *5 (N.D. Cal. Aug. 16, 2019)

25   (denying injunctive relief where the plaintiff did "not offer any indication of when it would be

26   driven out of business, or underlying financial information that would demonstrate imminent,

27   irreparable harm"); *Int'l Medcom, Inc. v. S.E. Int'l, Inc.*, 2015 WL 7753267, at *5 (N.D. Cal. Dec.

28

2, 2015) (denying a preliminary injunction where the plaintiff failed to show that its "survival [was] a matter of weeks or months").  Even where plaintiffs *do* provide evidence of potential losses (which Musi has not), courts have found such evidence insufficient where it is not clear that such losses would cause plaintiffs to be "driven out of business entirely."  *Putian Authentic Enter. Mgmt. Co. v. Meta Platforms, Inc.*, 2022 WL 888659, at *2 (N.D. Cal. Mar. 25, 2022).  The court in *Putian* denied injunctive relief where the alleged irreparable harm—that plaintiffs' business would "immediately and entirely shut down"—was supported only by a declaration from the plaintiffs' CEO attesting that the plaintiffs stood to lose "an estimated collective $1.12 million per day" without access to Meta's advertising platform.  *Id.*  Because there was also evidence that plaintiffs "earned approximately $68 million in gross revenue" in the year prior, the court found that plaintiffs had "not made an adequate showing that irreparable harm is likely without injunctive relief."  *Id.*

Musi primarily relies on *hiQ Labs, Inc. v. LinkedIn Corp.*, but in that case, the movant established that the defendant's cease-and-desist letter "stalled" a critical round of company financing and created "uncertainty" about the "future viability of [the] business" which caused several employees to leave the company.  31 F.4th 1180, 1189 (9th Cir. 2022) (finding "ample support" in the record to support the "credib[ility]" or plaintiff's "assertion that the survival of its business is threatened").  The movant in *hiQ Labs* further established that without the requested preliminary injunction, it would "be forced to breach its existing contracts with clients," which were essential to company survival.  *Id.*  Musi, by contrast, acknowledges that it still maintains its current customer base (and tellingly does not disclose the ongoing revenue that customer base provides).  Br. at 11.  And while it claims now to "lack[] the means of updating its app and acquiring new users" during this suit, *see* Wojnowski Decl. ¶ 8, it does not explain, let alone establish, why such a temporary interruption threatens the existence of its business.

Similarly, while "[i]n some instances, damage to reputation or goodwill, because it is difficult to calculate, qualifies as irreparable harm … broad or vague claims that the plaintiff 'may experience a loss of good will and customer confusion' … are insufficient to establish a likelihood

of irreparable harm." *Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, 2014 WL 5361548, at *5 (N.D. Cal. Oct. 20, 2014).   Musi cites purported uncertainty and confusion by potential and current customers as to whether they will continue to have access to the Musi app, Br. at 11, as well as potential harm caused by "copycat" apps—which, according to Musi, may cause existing users to delete the Musi app on the mistaken belief that the "copycat" apps are new versions of the original, *id. See also* Wojnowski Decl. ¶ 10.   But Musi "submits no evidence of actual customer confusion." *Cutting Edge Sols.*, 2014 WL 5361548, at *7.   And the Court "cannot rely on pronouncements … grounded in platitudes but must cite evidence that irreparable injury is likely in the absence of an injunction, and that legal remedies, such as money damages, are inadequate." *Id.* (internal quotation marks omitted).

### 2.   Musi Fails To Establish That The Balance of Equities Tips In Its Favor

In evaluating the equities, courts must "balance the interests of all parties and weigh the damage to each." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (affirming finding that balance of equities tipped in defendant's favor where plaintiff failed to show a likelihood of success on the merits); *see also Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 1005 (C.D. Cal. 2002) (denying preliminary injunction where, even "assuming *arguendo* that plaintiff ha[d] raised serious questions regarding the merits of its claim, the court [could not] find that the balance of hardships tip[ped] sharply in [plaintiff's] favor").   Here, the equities favor Apple.   Musi's requested injunction would significantly impact Apple's ability to effectively manage the distribution of third-party apps on App Store by exposing Apple to potential litigation for the allegedly infringing conduct of an app developer and forcing Apple to adjudicate disputes between rights holders and app developers—despite Apple's contractual right to *avoid* these burdens through discretionary termination.

First, as to the Musi app specifically, an injunction forcing Apple to distribute the app would expose Apple to significant legal risks.   Apple has a legitimate interest in avoiding burdensome litigation for the potentially infringing conduct of third-party developers on App Store.   That legal risk is not theoretical; Apple has had to litigate a number of lawsuits alleging

direct or contributory infringement related to third-party content on Apple platforms.  *See, e.g.*, *SA Music LLC v. Apple Inc.*, 3:20-cv-02965 (N.D. Cal. 2020) (copyright infringement action based on allegedly infringing recordings distributed through the Apple iTunes Store); *Pusztai v. Apple Inc.*, 3:21-cv-07995 (N.D. Cal. 2021) (copyright infringement action based on allegedly infringing third-party app distributed through App Store); *Krafton, Inc. v. Apple Inc.*, 2:22-cv-00209 (C.D. Cal. 2022) (same).  Here, multiple industry groups, representing the interests of a large number of artists and other copyright holders, along with major record labels, have alleged that the Musi app infringes their rights and demanded that Apple remove it from App Store.  Musi recognizes that Apple could face litigation if it continues to distribute its app, but argues that Apple "faces no risk of liability … because Musi already agreed to indemnify and hold Apple harmless with respect to any such claim via the [DPLA]."  Br. at 11-12.  Of course, Apple is under no obligation to take on this risk, and it is unclear that Musi *could* indemnify Apple, given Musi's contention that a temporary delisting of its app is sufficient to bring the company to the verge of extinction.  *See* Wojnowski Decl. ¶¶ 8-9 (claiming that without "access to the App Store" during the pendency of the litigation, Musi will "be forced to terminate its staff and shut its doors").  And the harm to Apple is not limited to its potential "liability," but includes harm to its reputation and interests if it is alleged to have participated in contributory infringement by the numerous rights holders that have complained about Musi.

Second, if Musi prevails on its request for injunctive relief, the effect of that ruling would be to force Apple to investigate and adjudicate the merits of future disputes between developers and third parties before removing an app from App Store.  App Store provides a safe and trusted place for consumers to find apps, it is not a forum for the adjudication of legal rights.  Apple receives around ten thousand third-party complaints each year.  Evan-Karimian Decl. ¶ 2.  Adjudicating the merits of every complaint would be a hugely burdensome undertaking and would expose Apple to additional legal risks.  Apple has a legitimate interest in avoiding those burdens not just for the allegedly infringing conduct of third-party developers on App Store, but also for the business decisions it makes in the face of complaints about potential infringement.  This is

precisely why, as Musi's own counsel has acknowledged, "Apple does not act as arbiter for disputes amongst third parties."  Elkin Decl. Ex. D at 2.

Finally, Musi's argument that the preliminary injunction "merely results in Apple being forced to do *what it has already promised to do* via the [DPLA]" is backwards.  Br. at 11 (emphasis in original).  *See also id.* at 12 ("Apple *chose* to arbitrarily remove the Musi app in breach of its own agreement and its duty of good faith and fair dealing[.]" (emphasis in original)).  It is *Musi* that contractually agreed that Apple could remove Musi's app from App Store at any time for any reason, including for potential intellectual property infringement, *see* Golinveaux Decl. Ex. A at 84 (DPLA, Schedule 1 § 6.3); *id.* Ex. B at 11 (DPLA, Schedule 2 § 7.3), 20 (DPLA, Schedule 3 § 7.3), and it is *Musi* that now seeks an order from this Court requiring Apple to reinstate Musi's app, in violation of Apple's contractual termination rights.  The equities do not support such a backwards outcome.

### 3.   Musi Fails To Establish That An Injunction Is In The Public Interest

The preliminary relief Musi seeks is not in the public interest.  "If … the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (vacating preliminary injunction and remanding for further proceedings where the district court failed to properly consider the public interest).  In this case, multiple organizations representing the interests of the music industry have raised concerns that Musi's streaming practices violate the copyrights of record labels, music publishers, recording artists, and songwriters, including, allegedly, by depriving copyright holders of the royalties to which they are entitled.  *See supra* § II.B.

It is not in the public interest for the Court to force Apple to distribute an app despite widespread concerns that the app infringes the intellectual property of nonparties who are not before the Court.  Indeed, an injunction requiring reinstatement of the Musi app would contravene the well-recognized interest in the protection of intellectual property rights.  *See, e.g.*, *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019) ("Courts often find that the public

has a strong interest in protecting intellectual property rights."); *Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, 2005 WL 1629813, at *7 (N.D. Cal. July 8, 2005) (denying motion for preliminary injunction where injunction would prevent enforcement of intellectual property rights, noting that such enforcement "serves the public interest").

Furthermore, as Musi itself also notes—but misapplies—"[t]he public has an interest in … enforcing contractual rights and obligations."  Br. at 13 (quoting *Abdou v. Davita, Inc*, 734 F. App'x 506, 507 (9th Cir. 2018)).  *See also Frank B. Hall & Co., Inc. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025-26 (8th Cir. 1992) (the public interest "does not favor forcing parties to [an] agreement to conduct themselves in a manner directly contrary to the express terms of the agreement"); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 853 (6th Cir. 2017) (noting that "[t]he public has a strong interest in holding private parties to their agreements" and holding that "the public's interest in enforcing private contracts weigh[ed] against the injunction").  Here, the express terms of the parties' agreements permit Apple to remove an app from App Store in its sole discretion.  Yet the injunction Musi seeks would compel Apple to reinstate the Musi app, nullifying Apple's unambiguous contractual right.

Finally, as courts in this District have recognized, Apple's ability to control which apps and developers are allowed on App Store serves the public interest by "provid[ing] a safe and trusted user experience on iOS[.]"  *Epic Games,* 559 F. Supp. 3d at 1038.

## V.   CONCLUSION

For the foregoing reasons, Apple respectfully requests that Musi's motion for a preliminary injunction be denied.

Dated:  November 15, 2024

WILMER CUTLER PICKERING
   HALE AND DORR LLP

By: */s/ Jennifer Milici*
Jennifer Milici (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
*jennifer.milici@wilmerhale.com*

Chris Johnstone, SBN 242152
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
*chris.johnstone@wilmerhale.com*

Mark A. Ford (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
*mark.ford@wilmerhale.com*

*Attorneys for Defendant Apple Inc.*