Jennifer A. Golinveaux (SBN: 203056)
JGolinveaux@winston.com
Samantha K. Looker (SBN: 340564)
SLooker@winston.com
WINSTON & STRAWN LLP
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1000333

Jeff Wilkerson (SBN: 284044)
JWilkerson@winston.com
WINSTON & STRAWN LLP
South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700

Attorneys for Plaintiff
MUSI INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| MUSI Inc.,<br><br>         Plaintiff,<br><br>    vs.<br><br>APPLE INC.,<br><br>         Defendant. | **Case No. 5:24-cv-06920-EKL**<br><br>**PLAINTIFF MUSI INC.'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    January 9, 2025<br>Time:   2:00 P.M.<br>Judge:  Hon. Eumi K. Lee<br>Place:  San Jose Federal Courthouse,<br>          Courtroom 7 – 4th Floor |

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ........................................................................................................... 1

II. ARGUMENT ................................................................................................................. 1

    A.  Musi Seeks a Prohibitory Injunction to Reinstate the Status Quo ..................................... 1

    B.  Musi Has Established a Likelihood of Success on the Merits ........................................... 2

    C.  Musi Has Established That It Is Likely to Suffer Irreparable Harm ............................... 10

    D.  Apple Fails to Show that the Balance of the Equities Do Not Weigh in Musi's Favor .. 12

    E.  Apple Fails to Show that a Preliminary Injunction is Not in the Public Interest ............ 13

III. CONCLUSION............................................................................................................ 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*,
  534 F. App'x. 633 (9th Cir. 2013) ...................................................................................... 12

*Anhing Corp. v. Thuan Phong Co.*,
  2015 WL 4517846 (C.D. Cal. July 24, 2015) ..................................................................... 11

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) .............................................................................................. 1

*Bus. Casual Holdings, LLC v. YouTube, LLC*,
  22-3007-cv, 2023 WL 6842449 (2d Cir. Oct. 17, 2023) ....................................................... 6

*Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*,
  524 F. Supp. 3d 919 (N.D. Cal. 2021) ............................................................................. 1, 2

*Coral Farms, L.P. v. Mahony*,
  63 Cal. App. 5th 719 (2021) ................................................................................................. 9

*Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*,
  No. 14-CV-02770-WHO, 2014 WL 5361548 (N.D. Cal. Oct. 20, 2014) ........................... 12

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) ............................................................................................. 1, 2

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) .............................................................................................. 1

*hiQLabs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) ............................................................................................. 11

*Kifle v. YouTube, LLC*,
  No. 21-cv-01752-CRB, 2021 WL 1530942 (N.D. Cal. Apr. 19, 2021) ............................... 7

*Lag Shot LLC v. Facebook, Inc.*,
  545 F. Supp. 3d 770 (N.D. Cal. 2021) ............................................................................... 10

*Nygard, Inc. v. Uusi-Kerttula*,
  159 Cal. App. 4th 1027 (2008) ............................................................................................ 9

*Optinrealbig.com, LLC v. Ironport Sys.*,
  323 F. Supp. 2d 1037 (N.D. Cal. 2004) ............................................................................. 12

*Peleg v. Neiman Marcus Grp., Inc.*,
  204 Cal. App. 4th 1425 (2012) .......................................................................................... 10

*Schneider v. YouTube, LLC*,
    649 F. Supp. 3d 872 (N.D. Cal. 2023) .................................................................................7

*Standard Operations, Inc. v. Montague*,
    758 S.W.2d 442 (Mo. 1988) ................................................................................................9

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) .............................................................................................12

*Tur v. YouTube, Inc.*,
    CV 06-4436 FMC (AJWx), 2007 U.S. Dist. LEXIS 50254 (C.D. Cal. June 20, 2007) ..................7

*Viacom Int'l Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ..................................................................................................6

**Other Authorities**

14A Cal. Jur. 3d Contracts § 215 ....................................................................................................9

## I. INTRODUCTION

Apple exercises unprecedented control over the only viable marketplace for digital apps for the most significant mobile platform in the world. In doing so, Apple positions itself as exercising this power as a neutral party that does not favor one app developer over another, but Apple's Opposition (Dkt. 30, "Opp.") reveals that it used its power over the App Store as part of a larger backchannel scheme with music-industry conglomerates bent on Musi's destruction, and without even informing Musi of discussions that led to its removal. Apple asks this Court to ignore its contractual obligations and representations that it would remain neutral during the app dispute process, and in the process gift it with yet more unprecedented power over the world's most important digital app platform. Unless this Court intervenes to force Apple to do what it said it would do (follow its contractual obligations and remove an app only when it "reasonably believes" after "review" that the app infringes intellectual property), Musi's decade-long success will be abruptly ended.

## II. ARGUMENT

### A. Musi Seeks a Prohibitory Injunction to Reinstate the Status Quo

Apple's argument that because Musi's injunction seeks reinstatement of the Musi app to the App Store, it is necessarily a mandatory injunction misses the key inquiry: "whether the party seeking the injunction seeks to alter or maintain the status quo." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023). Apple makes no attempt to establish what the status quo between the parties is. And under well-established Ninth Circuit law, the status quo is that Musi was listed on the App Store—Musi seeks only to reinstate the status quo. "[Th]e 'status quo' refers to the legally relevant relationship between the parties **before the controversy arose**." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (emphasis added). Stated otherwise, the "status quo" refers to "the last uncontested status which preceded the pending controversy[.]" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (citation omitted); *see also Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 950–51 (N.D. Cal. 2021) (where plaintiffs sought to enjoin enforcement of new immigration rule, "the last uncontested status preceding the current controversy is the status quo that existed prior to the implementation of the Rule," and the injunction was thus prohibitory in nature). Here, Musi was listed for over a decade on the App Store. Because this was

the "longstanding relationship" between the parties prior to Apple's actions upsetting the relationship, Musi's presence on the App Store is the status quo. *Fellowship of Christian Athletes*, 82 F.4th at 685 ("Here, the District's new policy of enforcing its non-discrimination rules likewise alters … a benefit that FCA enjoyed without issue for nearly 20 years…. [W]e hold that the status quo was one in which FCA enjoyed recognition."). It is Apple who chose to disrupt that status quo when it removed Musi based on improper backroom channeling. And actions "required to reinstate the status quo ante litem do not convert prohibitive orders into mandatory relief." *Centro Legal de la Raza*, 524 F. Supp. 3d at 951 (citation omitted).

### B. Musi Has Established a Likelihood of Success on the Merits

**1. Musi's removal was premised on an unfair process tainted by backroom conversations between Apple and music industry conglomerates, and not the process stipulated by the Developer Agreement.**

Apple consistently represented to Musi that it could not and would not arbitrate disputes, and that Musi must work directly with any complainant to resolve their concerns. *See* Dkt. 30-9 at 3. This hands-off approach is baked into Apple's app dispute guidelines, which Apple repeatedly disseminated to Musi. Thus, if a third party contends that an app violates its intellectual property rights, Apple's App Store Dispute webpage instructs it to submit an "App Store Content Dispute," and states that Apple will "contact the provider of the disputed content regarding your claim and ask that they work with you directly to resolve the issue." Declaration of Jennifer A. Golinveaux ("Golinveaux Decl."), Ex. 4. Likewise, in initiating an App Store dispute process, Apple instructs the parties to "exchange correspondence directly." Dkt. 1-3 at 2.[1] And in past correspondence with Musi, Apple similarly warranted that it "cannot serve as arbiter for disputes among third parties." Dkt. 30-9 at 3.[2] The implications of Apple's repeated hands-off representations were that in arriving at the "reasonable basis" decreed in the parties' Developer Agreement, Apple would take an impartial position that did not favor either side.

---

[1] Apple also instructed Musi that it could resolve disputes through "[w]ritten assurance of rights" including "confirmation that your application does not infringe Complainant's rights" and that removal from the App Store could result from "[f]ailure to respond to the Complainant or to take steps toward resolving a dispute." Dkt. 1-3 at 6–7.

[2] Apple acknowledges as much in its Opposition. Dkt. 30 at 9 ("Apple repeatedly reiterated, and Musi acknowledged, that Apple does not adjudicate disputes amongst third parties.").

1       Musi took Apple at its word. Thus, when Apple informed Musi of app disputes about its app,
2   Musi either adapted the Musi app to resolve those concerns or explained in direct correspondence to the
3   complainant why its app dispute was without merit. *See, e.g.*, Dkt. 10-18; Golinveaux Decl., Ex. 1 (Letter
4   to Wilson Sonsini). Recognizing the serious nature of app disputes that called into question Musi's
5   legitimate business, Musi went above and beyond—engaging counsel to thoroughly investigate the merits
6   of the app dispute, assuring Apple in good faith, and after a thorough legal assessment, that it does not
7   infringe on third party intellectual property rights, and assuring Apple that it recognizes its obligation to
8   hold Apple harmless and indemnify Apple under the Developer Agreement. *See, e.g.*, Golinveaux Decl.,
9   Ex. 1 (substantive response to YouTube); Dkt 1-6 at 1–2, 5 (providing required assurances to Apple).

10      But Apple's Opposition shows that, in removing the Musi app in September 2024, Apple did not
11  act in a neutral role; did not follow the process it set up for itself in resolving app disputes, and by
12  extension, the Developer Agreement; and instead acted as an arbiter (and without even informing Musi
13  of this fact or providing it with an opportunity to respond). While leaving Musi in the dark, Apple,
14  YouTube, and several music-industry conglomerates *decided* Musi's fate through backroom
15  conversations. Indeed, Apple's Opposition reveals that Apple and YouTube were engaged in direct
16  discussions about Musi, outside the app dispute process, shortly before Musi's removal, and *before* the
17  YouTube app dispute that Apple pretended was the reason for its removal of the Musi app was filed. Dkt.
18  30-8 at ¶ 7. During those discussions, YouTube made some kind of complaint about Musi (Apple *still*
19  does not disclose the details). *Id*. And only after that call, YouTube submitted a written, five-word app
20  dispute calling for the Musi's app removal—these five words were the *only* details shared with Musi.
21  Dkt. 10-17. When Musi attempted to contact YouTube directly regarding this cryptic notice, reminding
22  YouTube of the parties' prior communications through outside counsel and inviting it to participate in a
23  discussion, YouTube—as Apple well knew—refused to respond. Dkt. 10-18; Dkt. 10-19. And why would
24  it? Apple's removal of the Musi app was less a question of "why" than "when."

25      Seeking to justify its actions, Apple references "dozens" of app disputes (over the more than a
26  decade Musi has been available on the App Store). But putting aside that Apple never told Musi that any
27  app dispute other than YouTube's five-word assertion led to Apple's removal of the Musi app, Apple's
28  description of these other app disputes is riddled with inaccuracies.

Start with the International Federation of the Phonographic Industry ("IFPI"): it is true that Musi and the IFPI engaged in dialogue over several months via the app dispute process. But as Apple is aware, the IFPI expressly *disavowed* any claim under U.S. Copyright law. IFPI baldly asserted violations of European law, but as Musi's UK solicitor explained, those claims were baseless. *See* Golinveaux Decl., Ex. 3 (September 11, 2023 IFPI Letter). More important, Apple did not remove the Musi app because of the IFPI app dispute—in the European market or otherwise—but rather took no action other than following up on communication between the parties, with the last communication occurring in May 2024. Golinveaux Decl. at ¶ 4. Nor did any of IFPI's members ever initiate any legal proceedings against Musi. It is thus no surprise that Apple never asserted until its Opposition, in an apparent attempt to bolster its basis for the unjust removal of the Musi app, that any complaint from IFPI was relevant to Apple's removal of the Musi App.

Apple's new assertion that Sony Music Entertainment ("SME") app dispute was factored into Musi's removal is even more disturbing. Musi was notified that SME filed an App Store dispute in July 2023 (a complaint that, again, Apple never told Musi had anything to do with its removal). But when Musi attempted to open a dialogue with SME, SME stated that *it had no complaint*, and that the complaint belonged to IFPI. *See* Golinveaux Decl. Ex. 2. No further action was taken in regard to this complaint.

As for YouTube and the NMPA, Apple's assertion that Musi "knew" it was removed based on more than YouTube's five-word complaint is simply false. Apple admits that Musi was not privy to Apple's backchannel conversations with YouTube. And Apple's correspondence with Musi never suggested that the Musi app's removal was based on such conversations. Nor was Musi afforded any opportunity to respond to YouTube's claims (the nature of which, again, was not shared with Musi.) Declaration of Aaron Wojnowski ("Wojnowski Decl.") at ¶ 14. Apple does not and cannot dispute that YouTube *never responded to Musi's attempts at contact*, nor that Musi repeatedly informed Apple of YouTube's lack of communication. Apple instead relied on YouTube's backdoor, undisclosed, and unverified representations while discrediting Musi's direct communication, in contravention of both its repeated assertions that it could not and would not arbitrate the parties' dispute and the app dispute process Apple itself had constructed.

Musi's outside counsel substantively communicated with YouTube's counsel via a letter sent in 2021, which was the last time that YouTube ever offered to Musi any purported basis for its complaint relating to the Musi app. *See* Golinveaux Decl., Ex. 1. In that letter, Musi explained:

- The Musi app allows users to interact with YouTube's publicly available content with added functionality.

- Musi's functionality only interacts with public-facing YouTube webpages; the app does not "hack," scrape, or circumvent YouTube's interface, system, or content.

- Musi only allows users to access YouTube's content without modification, for that user's "personal, non-commercial use," in keeping with YouTube's Terms of Service.

- Musi does not store YouTube content on its servers, and YouTube content does not pass through Musi's system. Rather, content is streamed directly from YouTube to a user's device per a user's request.

*Id.* If YouTube disagreed with Musi's analysis and explanation, or had further questions, it could and should have engaged in further dialogue with Musi, or even instituted legal proceedings, where Musi would have thoroughly defended its position. YouTube did neither. In fact, YouTube simply *did not respond*—a pattern it continued in 2024 in the weeks before Apple removed the Musi app. Thus, neither at the time of earlier discussions in 2021 nor after its five-word complaint in September 2024 did YouTube ever reply to Musi's substantive explanation for why it did *not* violate YouTube's Terms of Service—a tacit admission that there was no violation. In any event, for purposes of this action, Apple's complete disregard for any representations made by Musi in the dispute process, as well as Apple's apparent failure to consider YouTube's complete lack of response to Musi—while at the same time engaging in closeted discussions with YouTube—renders baseless Apple's claim that it complied with the obligations set forth in the Developer Agreement and the app dispute process.

Apple's reliance on a letter it received from the NMPA only further illustrates Apple's dereliction of its purported commitment not to arbitrate disputes. The NMPA has never filed an app dispute against Musi or even contacted Musi whatsoever. And neither Apple nor the NMPA ever disclosed that letter or its contents to Musi (let alone informed Musi that it formed the basis for Apple's removal of the Musi

app). That letter thus could not provide any reasonable basis to remove the Musi app and, indeed, it contains several false claims:

- The Musi app has never, as the NMPA letter claims, been removed from the Google Play Store, because it has never been offered for sale on the Google Play Store.

- Musi does not, as the letter claims, rely on or access the YouTube Data/iFrame Application Programming Interface API (and therefore, Musi is not subject to the YouTube API Services Terms of Service).

- Musi does not, as the letter claims, give users the ability to "mute ads," rather Musi accesses video media directly from YouTube and does not interfere with any ads to the extent they are included within the publicly-available video media that is streamed by the Musi app's user.

- Musi does not, as the letter claims, use "multiple API-tokens" and "API-token bucketing."[3]

*See* Wojnowski Decl. at ¶¶ 15–17.

In short, when informed of app disputes, Musi has always followed Apple's clear instructions and representations regarding such disputes, and the obligations it imparts on developers as part of the Developer Agreement. But there was apparently no reason for Musi to have done so, as its fate was sealed by backroom conversations.

Setting aside the substance of any app disputes, Apple's reliance on the *number* of complaints about the Musi app is meritless. Musi was a top 200 app with millions of users— three app disputes lodged in 2024 is hardly alarming, especially where Apple claims to handle thousands of such disputes a year. Opp. at 3. Apple's suggestion otherwise is particularly rich in the context of a complaint by YouTube, which has likely received an astronomical number of copyright complaints. And unlike Musi—which has never been sued for copyright infringement—YouTube defended a years-long litigation from Viacom in the Second Circuit alleging massive copyright infringement. *See Viacom Int'l Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012).[4] But curiously, Apple never pulled YouTube from the

---

[3] Such "token-bucketing" would involve registering multiple API keys and distributing them to different users, thus defeating quotas or rate limits on YouTube Data/iFrame API tokens. But because Musi does not use YouTube's Data/iFrame API, it has no need for such a practice. Wojnowski Decl. at ¶ 16.

[4] YouTube has been sued for allegedly infringing IP rights in several matters over the years. *See Bus. Casual Holdings, LLC v. YouTube, LLC*, 22-3007-cv, 2023 WL 6842449 (2d Cir. Oct. 17, 2023)

App Store in the wake of that dispute. What's more, what Apple touts as "dozens" of complaints against Musi during the over ten years it was available on the App Store were all closed without legal action.

Lastly, Apple's reliance on a few hit pieces about Musi commissioned by the music industry is baseless. *See, e.g.*, Dkt. 30-6. Those articles signify nothing other than a one-sided press push by the same players involved in the backroom discussions with Apple, seeking to conjure up an image of support for Musi's removal. It's unclear from Apple's Opposition brief when it became aware of such articles, but its crediting of those arguments is just another knock to Apple's purported "neutral" status. Bottom line: The Musi app's removal from the Apple App Store was the result of a one-sided affair between Apple, YouTube, and several music industry conglomerates. It was patently unfair, carried on without any input from Musi, did not reflect any good-faith inquiry into the truth, and was not based on any reasonable conclusion that Musi was violating anyone's intellectual property rights.

> 2. **Apple breached its obligation to conduct a human and/or systematic review resulting in a "reasonable belief" of Musi's infringing nature.**

Surely recognizing that the facts are hard to explain, Apple claims it needs no explanation. Rather, it boasts that the Developer Agreement gifts it with "unfettered discretion" concerning the App Store's management, and that Musi is erroneously seeking to "limit" Apple's rights under the contract. Opp. at 13. Musi does no such thing. The Developer Agreement *itself* limits Apple's app-removal powers, and based on the above, Apple acted *outside* of those powers.

Schedule 1 § 6.3 states:
> Apple reserves the right to cease marketing, offering, and allowing download by end-users of the Licensed Applications at any time, with or without cause, by providing notice of termination to You. Without limiting the generality of this Section 6.3, You acknowledge that Apple may cease allowing download by end-users of some or all of the Licensed Applications, or take other interim measures in Apple's sole discretion, if Apple reasonably believes, based on human and/or systematic review, and, including without limitation upon notice received under applicable laws, that: (i) those Licensed Applications are not authorized for export to one or more of the regions designated by You under Section 2.1 hereof, in accordance with the Export Administration Regulations

---

(involving copyright claims against YouTube related to posted videos); *Tur v. YouTube, Inc.*, CV 06-4436 FMC (AJWx), 2007 U.S. Dist. LEXIS 50254 (C.D. Cal. June 20, 2007) (same); *Schneider v. YouTube, LLC*, 649 F. Supp. 3d 872 (N.D. Cal. 2023) (same); *Kifle v. YouTube, LLC*, No. 21-cv-01752-CRB, 2021 WL 1530942 (N.D. Cal. Apr. 19, 2021) (involving copyright and trademark claims concerning posted videos).

or other restrictions; (ii) those Licensed Applications and/or any end- user's possession and/or use of those Licensed Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party; (iii) the distribution and/or use of those Licensed Applications violates any applicable law in any region You designate under Section 2.1 of this Schedule 1; (iv) You have violated the terms of the Agreement, this Schedule 1, or other documentation including without limitation the App Review Guidelines; or (v) You or anyone representing You or Your company are subject to sanctions of any region in which Apple operates. An election by Apple to cease allowing download of any Licensed Applications, pursuant to this Section 6.3, shall not relieve You of Your obligations under this Schedule 1.

Dkt. 10-3 at 85. The first sentence grants Apple the right to "cease marketing, offering, and allowing download" of applications from the App Store "with or without cause" via termination notice. The second sets forth procedures Apple must follow before making a removal decision; specifically, it must conduct a "human and/or systematic review" based upon which it has a "reasonabl[e] belie[f]" that the Licensed Application violates the Developer Agreement's terms, including (as relevant here) intellectual property infringement. And the third requires the developer to maintain compliance with its obligations under the agreement even after its application is removed.

What is the nature of the "human and/or systematic review" required by Section 6.3? Section 4.1(g) of the Developer Agreement provides an answer: "in the event a dispute arises over the content of Your Licensed Applications or use of Your intellectual property on the App Store . . ., You agree to permit Apple to share Your contact information *with the party filing such dispute* and to follow Apple's *app dispute process* on a non-exclusive basis and without any party waiving its legal rights." *Id.* at 84 (emphasis added). Thus, by its terms, the Developer Agreement limits Apple's discretionary removal power by requiring the parties *and only the parties* to participate in the app dispute process before an application is deemed removable. Apple did not do this. Instead, Apple inserted itself into the dispute as arbiter, and then had discussions with only one side—the side of the music industry conglomerates. And it did so even though Musi *directly* informed Apple that it had been reaching out to the putative complainant, YouTube, and was not receiving a response. This is not good-faith "review," and nothing about this one-sided process could create a "reasonable belief" that Musi was violating anyone's legal rights.

Apple's Opposition makes no meaningful attempt to interpret Section 6.3's second sentence. Instead, Apple suggests that that sentence's "[w]ithout limiting the generality" clause means that it enjoys unfettered discretion and may remove an app whenever it wants, however it wants, and *regardless* of whether it conducted a "human and/or systematic review" resulting in a "reasonable belief" of the app's infringing nature beforehand. This interpretation is wrong for three reasons.

First, Apple's reading would render Section 6.3's second sentence entirely superfluous, violating the fundamental principle of California contract law that a contract must be "read as a whole, so as to give effect to every part, if reasonably practicable," in order to "avoid rendering terms surplusage." *E.g.*, *Coral Farms, L.P. v. Mahony*, 63 Cal. App. 5th 719 (2021) (citations omitted); 14A Cal. Jur. 3d Contracts § 215 (collecting cases). If Apple has unfettered discretion to remove an app, as it claims, then the references to a "human and/or systematic review," to a "reasonable belief," and to five specific and defined conditions that warrant removal would be entirely meaningless—lines and lines of carefully worded contractual requirements and conditions with no force at all.

Second, and contrary to Apple's contention, Section 6.3's use of the phrase "[w]ithout limiting the generality" does not forbid any and all limiting constructions. To the contrary, courts have applied limiting constructions to contractual provisions containing that same phrase where the provision was susceptible to further interpretation. *See, e.g.*, *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027 (2008); *see also Standard Operations, Inc. v. Montague*, 758 S.W.2d 442 (Mo. 1988).

In *Nygard*, for example, the court interpreted a confidentiality agreement in an employment contract. *Nygard*, 159 Cal. App. 4th at 1046. Specifically, the court construed the phrase "any information, knowledge or data of the Company" as *limited* to the kinds of protected information that were enumerated in the following sentence, despite a clause that the examples given were "*without limiting the generality of the foregoing.*" *Id.* at 1045 (emphasis added). Noting that all the enumerated examples related to "proprietary information or trade secrets," the court held that the plaintiffs' disclosures about his working conditions and the company's celebrity clientele did not violate the confidentiality agreement. *Id.* at 1046. Thus, despite the contract broadly covering "any information, knowledge or data of the Company," and the phrase "without limiting the generality of the foregoing," the Appellate Division applied a limiting construction to the contract's scope.

Third, if Apple's construction is correct, then Section 6.3 is facially contradictory. On Apple's interpretation, the first sentence of Section 6.3 gives Apple unfettered discretion remove apps for any reason. But the second sentence subjects Apple's removal to required procedures and a "reasonable belief" that specific conditions have occurred. If Apple is right, then these two sentences are not reconcilable, and the agreement then must be deemed ambiguous. And ambiguous contractual provisions are construed in favor of the non-authoring party: Musi. *See, e.g.*, *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1445 (2012) ("The reason for this rule is to protect the party who did not choose the language from the unintended or unfair result." (quotation omitted)).

Thus, Apple had to conduct a "human and/or systematic review" aimed at determining whether there was a "reasonabl[e] belie[f]" that the Musi app infringed the intellectual property rights of third parties by remaining neutral during the app dispute process. Apple did not do this—as Musi' motion shows, and as Apple's Opposition only emphasizes. Accordingly, Musi has shown a likelihood of success on the merits.

### C. Musi Has Established That It Is Likely to Suffer Irreparable Harm

Apple does not dispute that the threat of being driven out of business can support a finding of irreparable harm. *See* Opp. at 19 (citing *Lag Shot LLC v. Facebook, Inc.*, 545 F. Supp. 3d 770, 787 (N.D. Cal. 2021)). Instead, Apple takes issue with Musi's evidence being too "speculative." Not so. The threat to Musi is existential and extant. Several weeks have passed since Musi filed its motion, and it has become ever more apparent that Apple's actions are irreparably harming, and threatening to destroy, the successful business that Musi has spent over a decade building within months.

Apple appears to be stuck on Musi's size, repeatedly making references to the number of employees it believes Musi has. Opp. at 19. But a threat to a large business is no more compelling than a threat to a small one. Indeed, Musi has but *one* product, the Musi app, which was offered solely to users of devices for which the App Store is the only viable marketplace. With that app no longer available for download, Musi cannot attain new users, cannot long retain existing users, and cannot even make upgrades or updates to the Musi app for those users it can retain. Moreover, without the ability to make upgrades or updates to the Musi app, an update to Apple's iOS could render the Musi app inoperable even for existing users. Wojnowski Decl. at ¶¶ 8–9. This inability to grow and retain business is creating

a downward spiral that is irreparably damaging Musi's business and that threatens its very existence. *Id*. at ¶ 10; *See hiQLabs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188–89 (9th Cir. 2022) (irreparable harm established where plaintiff's business had no "viable way" to continue to operate).

Apple has no real argument to rebut Musi's showing that it cannot attain new users unless it is restored to the App Store. And Musi's user acquisition data paints a stark reality: before its removal, Musi was enjoying an average of 886,148 new users a month. Wojnowski Decl. at ¶ 2. Now, of course, that number is zero. *Id*. This inability to gain new customers also constitutes irreparable harm. *hiQ Labs*, 31 F.4th at 1189 (inability to close deals with "prospective clients" factored into finding of irreparable harm).

Unable to address this point, Apple instead focuses on Musi's existing users, claiming it has nothing to fear because those users can continue to access the app. But this argument is facile, as Apple well knows. With the Musi app no longer available for download, existing users can lose access to the app at any time, including if the app is offloaded at any time, which is typical if they start using a new phone, or, in certain cases, by updating an iPhone's iOS. Wojnowski Decl. at ¶ 2. And once a user loses access to the Musi app, they cannot get it back. *Id*.at ¶ 3. Musi has already received many inquiries from users who unknowingly lost access to the app in these two ways. *Id*. at ¶ 5–6, Exs. A, B, C, D, and E. Given how often users purchase new iPhones and routinely update their iPhone's iOS (which often requires users to offload apps to free up storage space), Musi will continue to rapidly lose its existing customer base, which has and will cause irreparable harm to Musi's business. *Id.* at ¶¶ 4, 7.

Further, as it cannot update the app, Musi is prevented from competing and has already suffered permanent economic and reputational harm. Already, users are soliciting alternative apps to replace Musi. *Id*. at ¶ 8, Ex. F. And as this litigation could take *years* to play out fully, Musi will continue bleeding both new and existing users to competitors who can offer exciting, innovative app updates. *Id*. This is backed up by Musi's user engagement data, which has plummeted since its removal from the App Store. *Id*. at ¶ 4. Indeed, Musi's daily-active user base has dropped by 1.5 million users, and its monthly user base has plummeted by 3 million. *Id*. This critical loss of customer base is exactly the kind of harm courts routinely find is incapable of monetary redress. *Anhing Corp. v. Thuan Phong Co.*, 2015 WL 4517846, at *23 (C.D. Cal. July 24, 2015) ("Evidence of intangible injury, such as a loss of customers or damage to a

party's goodwill, can constitute irreparable harm."); *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x. 633, 636 (9th Cir. 2013) (similar). At the current rate of loss, and factoring in the significant likelihood that the Musi app could be rendered inoperable at a moment's notice, Musi's business will be decimated over the next 12 months. Wojnowski Decl. at ¶ 10; *Optinrealbig.com, LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004) (finding irreparable harm where defendant's conduct threatened plaintiff's continued business operations).

Since Apple removed the Musi app, at least a dozen imposter Musi apps have appeared on the App Store. Wojnowski Decl. at ¶ 11. And since moving for an injunction, Musi has received multiple inquiries from customers who mistakenly downloaded copycat apps. *Id*. at ¶ 12, Exs. G, H, I, J. Given the scam nature of these apps, it is unsurprising that users reported several quality issues and missing features that they expected from the Musi app. *Id*., Exs. G, H, I, J. Users have blamed Musi for these issues, not realizing the apps were fakes. *Id*. This too is a severe hit to Musi's goodwill and reputation, built up over more than a decade. Imposter apps were much easier to deal with before Musi's removal, as Musi appeared near the top of search results, had millions of positive user reviews, and held top chart positions, including being featured on several top-of charts. *Id*. at ¶ 13. Given the clear evidence of confusion, Apple's cited case does not apply. Opp. at 20–21, citing *Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, No. 14-CV-02770-WHO, 2014 WL 5361548, at *7 (N.D. Cal. Oct. 20, 2014) (finding no irreparable harm where "there is ***no*** evidence of ***any*** actual or even likely customer or distributor confusion") (emphasis added). Far more applicable here is the well-settled law that "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).

### D.    Apple Fails to Show that the Balance of the Equities Do Not Weigh in Musi's Favor

Apple claims that "Musi's requested injunction would significantly impact Apple's ability to effectively manage" its App Store because it would "forc[e] Apple to adjudicate disputes between rights holders and app developers." Opp. at 21. That is wrong. Musi is not seeking to compel Apple to adjudicate disputes—it seeks to compel Apple only to follow the process *already enumerated* in the very Developer Agreement that Apple authored, which mandates that Apple conduct a "human and/or systematic review"

and reach a "reasonable belief" as to whether an app a violates any of the Agreement's terms before removing the app from its App Store. Indeed, the Developer Agreement *already* enumerates a rights holder-developer dispute process in Section 4.1(g). Dkt. 10-3 at 84.

Apple's purported fear of future litigation risk is also bluster. Musi has operated for over ten years on the App Store—not a single legal complaint alleging infringement has been filed against it, let alone against Apple. And Apple did not even ask Musi for its response regarding its backroom discussions with YouTube and the NMPA. Musi filed this case and moved for a preliminary injunction as quickly as possible after Apple removed the Musi app from the App Store. In short, Musi's availability on the App Store is the status quo, and does not pose any threat to Apple.[5]

### E. Apple Fails to Show that a Preliminary Injunction is Not in the Public Interest

None of Apple's arguments that Musi's motion contradicts the public interest withstand scrutiny. *See* Opp. at 23–24.

First, Apple's argument that "[i]t is not in the public interest for the Court to force Apple to distribute an app despite *widespread* concerns that the app infringes the intellectual property of nonparties" takes liberties with the term "widespread." *See id.* at 23 (emphasis added). As Apple's opposition makes clear, it has never conducted any review of the relevant facts and has no "reasonable belief" that the Musi app violated intellectual property rights. Nor does Apple cite any other source that accurately discusses Musi's operation or how or why it would constitute a violation of any legal rights. And of course, despite over a decade of operations, no one has *ever* sued Musi for any violation of IP rights. Rather, Apple's decision was motivated by *appeasement* of a select few "organizations representing the interests of the music industry" who raised baseless accusations concerning the Musi app's functionality. *Id.* Accusations that Musi has readily disproven, now that it has been afforded the opportunity to do so.

Second, Apple states that "[t]he public has an interest in … enforcing contractual rights and obligations." Opp. 24 (quotation omitted). On this front, Musi wholeheartedly agrees: it is in the public

---

[5] Apple's jab about Musi's ability to indemnify Apple (Opp. at 22) is backwards. The threat to Musi's finances was created by Apple's own unfounded actions—Apple's argument is like cutting off a distance runner's legs and then, when he complains, questioning whether he was ever really that fast to begin with.

interest to compel Apple to comply with its contractual obligations. It failed to do so. And for that reason, granting Musi's motion does not "nullif[y] Apple's unambiguous contractual right[s]." Opp. at 24. Quite the opposite. It makes those rights concrete and enforceable.

Finally, Apple claims that Musi's motion contravenes the public interest because, without unfettered power, Apple supposedly cannot "provid[e] a safe and trusted user experience on iOS." Opp. at 24 (quotation omitted). Hogwash. Users cannot enjoy a "trusted user experience" if Apple is gifted with unfettered discretion concerning the governance of the App Store, particularly not when it uses that discretion to remove one of the largest apps based on bogus claims of IP infringement and without even informing the app developer of the nature of the complaints (or, in the case of the NMPA, even the existence of the complaint) or allowing any substantive response. It is Apple's own capricious and baseless exercise of what it claims is unfettered discretion that undermines trust.

Apple's removal of the Musi app was not premised on the findings of a neutral review, or even a genuine discussion. Instead, Apple removed the app because a select few music industry conglomerates saw the Musi app as a threat and, using unique access to Apple, engaged in backroom conversations to ensure that the Musi app could no longer compete on the platform. Thus, the public interest strongly supports the granting of Musi's motion. Apple's claim to unfettered discretion is only a quest for power to operate the App Store for the benefit of a few powerful stakeholders, and at the expense of small developers—exactly what happened here. Granting Musi's motion avoids that outcome.

### III.  CONCLUSION

For these reasons, Musi requests that the Court grant its motion for a preliminary injunction.

Dated: December 6, 2024

Respectfully submitted,

WINSTON & STRAWN LLP

By:  /s/ Jennifer A. Golinveaux
     Jennifer A. Golinveaux
     Jeff Wilkerson
     Samantha K. Looker

     Attorney for Plaintiff
     MUSI INC.