UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUSI INC.,<br><br>        Plaintiff,<br><br>        v.<br><br>APPLE INC.,<br><br>        Defendant. | Case No. 24-cv-06920-EKL<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 10 |

This action arises out of Defendant Apple Inc.'s decision to remove Plaintiff's music streaming application (the "Musi app") from the App Store following complaints that the Musi app violates third-party intellectual property rights. Before the Court is Plaintiff's motion for a preliminary injunction that would require Apple to continue offering the Musi app for download through the App Store. *See* Mot. for Prelim. Inj., ECF No. 10 ("Motion"). The Court reviewed the briefs and supporting exhibits and heard argument on January 9, 2025. At the conclusion of the hearing, the Court denied the Motion, noting that a written order would follow. Min. Entry, ECF No. 37. This Order provides the reasons for the Court's ruling.

I.     **BACKGROUND**

    **A.**     **The Musi app and the App Store**

Plaintiff Musi Inc. ("Musi") is "the developer, owner, and operator of the Musi app," a music streaming application that draws from "publicly available content on YouTube's website." Compl. ¶ 2, ECF No. 1. The Musi app was offered for download through the App Store for years until it was removed on September 24, 2024. *See id*.

The App Store is an electronic store operated by Apple through which developers can offer a wide variety of applications for Apple device users to download. *See* Apple Developer Program

1   License Agreement at 2, ECF No. 10-3 ("DPLA").  It would be hard to overstate the App Store's

2   commercial success and popularity with users and developers alike.  When it launched in July

3   2008, the App Store offered users just a few hundred applications.  *See* Golinveaux Decl. Ex. F at

4   1, ECF No. 10-8.  Since then, the App Store's offerings have expanded tremendously.  Today, the

5   "App Store is home to about 2 million apps with only about 60 from Apple, meaning that more

6   than 99.99% of apps are third-party apps."  Golinveaux Decl. Ex. H at 1, ECF No. 10-10.  Users

7   download applications from the App Store hundreds of millions of times on average each week.

8   Golinveaux Decl. Ex. J. at 3, ECF No. 10-12.

9         Apple benefits from the growth of the App Store ecosystem "directly through App Store

10  commissions" and "indirectly as the value users get from their iPhones increases."  Golinveaux

11  Decl. Ex. H at 8.  Third-party developers like Musi benefit from the App Store, too, because it

12  allows them to market and distribute their applications to millions of users.  Apple calculated that,

13  within the first decade of the App Store's launch, developers "earned over $100 billion from the

14  App Store."  Golinveaux Decl. Ex. G at 7, ECF No. 10-9.  And in 2022, the App Store facilitated

15  "$1.1 trillion in developer billings and sales" with "more than 90 percent of the billings and sales

16  accruing solely to developers and businesses of all sizes."  Golinveaux Decl. Ex. J. at 2.  Finally,

17  and perhaps most important, users benefit from the growth of the App Store ecosystem because

18  they can seamlessly download and use a wide variety of applications – including to stream music.

19  Golinveaux Decl. Ex. H at 24-25 (noting that "many music streaming services" are available

20  through the App Store).

21        The Musi app has been popular with users.  "Musi has continuously been a top 200 app in

22  the App Store for years."  Wojnowski Decl. ¶ 4, ECF No. 10-1.  One report estimates that the

23  Musi app has been downloaded "more than 66 million times since launching" and was

24  downloaded 8.5 million times in 2023 alone.  Milici Decl. Ex. 2 at 2, ECF No. 30-3.  According to

25  Musi, "Musi was gaining an average of 886,148 new users per month" in the four months before

26  Apple removed the Musi app from the App Store.  Wojnowski Reply Decl. ¶ 2, ECF No. 31-1.

27

28

### B. Music Industry Complaints About the Musi app

Despite the popularity of the Musi app, not everyone is a fan. Indeed, Apple claims that it has received "over a dozen third-party complaints" regarding the Musi app, including complaints that the Musi app violates intellectual property rights. Evan-Karimian Decl. ¶¶ 3-4, ECF No. 30-8. The parties provided extensive documentary evidence regarding a complaint by the International Federation of the Phonographic Industry (the "IFPI"), so the Court focuses on that complaint here.

On July 27, 2024, the IFPI, which "promotes the interests" of "some 8,000 major and independent record companies in over 70 countries," complained to Apple that the Musi app infringes its members' intellectual property rights. Evan-Karimian Decl. Ex. 1 at 6-7, 54-55, ECF No. 30-9 ("IFPI Dispute Email"). According to the IFPI, the Musi app reproduces and distributes IFPI members' sound recordings and audiovisual works to the public without authorization. *Id*. at 54-55. Upon receiving the IFPI complaint, Apple forwarded it to Musi and instructed Musi to provide "written assurance that [the Musi app] does not infringe [the IFPI's] rights, or that the parties are taking steps to promptly resolve the matter." *Id*. at 56. Apple warned Musi that developers "with a history of allegations of repeat infringement . . . are at risk of termination from the Developer Program" and that "[f]ailure to respond to the [IFPI] or to take steps toward resolving a dispute may lead to removal of the app(s) at issue." *Id*. at 59. In response, Musi called the IFPI's claims "unsubstantiated," but also represented that it would communicate directly with the IFPI "to attempt to come to a timely resolution of this dispute." *Id*. at 51-52.

Months passed without progress. The IFPI periodically updated Apple that its complaint was not resolved because the Musi app "continues to infringe the rights of [its] member companies." *Id*. at 22-24, 28-30. The IFPI also complained that Musi was "circumventing the technical protection measures (TPMs) which YouTube has implemented to protect IFPI Member Content." *Id*. at 22-24. The IFPI implored Apple repeatedly to remove the Musi app from the App Store to address the alleged infringement. *See, e.g.*, *id*. at 2, 8, 12, 18-19, 24, 35. Musi maintained its position that the IFPI complaint was "without merit." *Id*. at 20-21.

3

On January 17, 2024, nearly six months after initiating its complaint, the IFPI told Apple that Musi "has made no material changes to the app." *Id*. at 18. Apple asked the IFPI to "provide evidence that the current version of the app infringes [the IFPI's] intellectual property rights." *Id*. at 15-16. The IFPI responded with "screenshots showing the availability of [its member's content] through the [Musi] application," citing to an example of Harry Style's hit song, "As It Was." *Id*. at 11-12. The IFPI also explained that the Musi app "includes functionalities, such as allowing users to stream IFPI Member Content from a mobile device when the user's screen is locked and non-video playback," that were not authorized by the relevant right holders. *Id*.

On April 15, 2024, the IFPI's correspondence with Apple shifted to a more adversarial tone. The IFPI argued that, based on the evidence it had provided, "Apple has the requisite knowledge of [Musi's] illegal activity as referred to in Article 6 of the EU Digital Services Act" – implying that the IFPI could hold Apple liable under EU law for Musi's alleged infringement. *See id*. at 6-8. After receiving this implied threat of legal action, Apple told Musi that if "the matter is not resolved shortly, Apple may be forced to pull your application(s) from the App Store." *Id*. at 5. Yet Musi maintained its position that the Musi app does not infringe IFPI members' rights and does not breach YouTube's terms of service. *Id*. at 4.

Apparently, Musi never resolved the IFPI's complaint. The last communication in the record is a May 7, 2024, letter from the IFPI to Musi stating: "It is clear that we have reached an impasse in correspondence." Evan-Karimian Decl. Ex. 5 at 1, ECF No. 30-13.

### C. YouTube's Complaint and Apple's Removal of the Musi app

Musi has also received complaints from YouTube, and the two companies have "engaged in sporadic conversations" since 2015. Wojnowski Decl. ¶ 6. From Musi's perspective, "Musi has repeatedly expressed its commitment to offer the Musi app in a way that complies with YouTube's Terms of Service." *Id*. When YouTube raised concerns, in some cases, Musi "adjusted the app's functionality." *Id*. ¶ 7. But in recent years, Musi has elected not to modify the Musi app, and instead maintains that the Musi app fully complies with YouTube's terms. *See id*.

In April 2021, YouTube's outside counsel wrote to Musi, claiming that the Musi app violated YouTube's terms by: (1) accessing and using YouTube's non-public interfaces, (2) using

4

YouTube's services for commercial purpose, and (3) selling advertising on "any website or application" where YouTube's service was "the primary basis for such sales." Compl. ¶ 32; *see also* Elkin Decl. ¶ 2, ECF No. 10-16. In response to this complaint, Musi did not modify the Musi app. Instead, Musi sent YouTube a letter calling YouTube's complaints "unfounded." Golinveaux Reply Decl. Ex. 1 at 2, ECF No. 31-13. In this letter dated May 5, 2021, Musi did not deny selling advertising that is displayed on the Musi app while users stream content from YouTube. Instead, Musi argued that the "functionality offered by the Musi app is of sufficient value to justify Musi's advertisement sales." *Id*. Musi claims that YouTube did not respond to Musi's May 2021 letter. Elkin Decl. ¶ 2.

On March 22, 2023, YouTube again complained to Apple that the Musi app violated YouTube's terms of service. *Id*. ¶ 3; Compl. Ex. C at 6, ECF No. 1-3. Musi claims that it "promptly responded" to YouTube's complaint, and that YouTube never replied. Elkin Decl. ¶ 3; *see also* Compl. Ex. C at 2-5.

On July 15, 2024, Apple had a phone call with YouTube, including in-house counsel from both companies, "to follow up on earlier complaints YouTube itself had submitted regarding the Musi app."[1] Evan-Karimian Decl. ¶ 7. "During this phone call, YouTube confirmed its position that the Musi app violates YouTube's Terms of Service, including by misusing YouTube's Application Programming Interface ('API'). YouTube also requested the removal of the Musi app from App Store." *Id*.[2]

On August 8, 2024, Apple notified Musi that it received a complaint from YouTube on July 29, 2024, alleging that the Musi app infringes YouTube's intellectual property rights and violates its terms of service. Elkin Decl. Ex. A, ECF No. 10-17. On August 12, 2024, Musi told Apple that it has "been in communication directly with [YouTube] on this matter in order to

---

[1] Apple did not disclose this phone call to Musi until Apple filed its opposition to Musi's Motion. Wojnowski Reply Decl. ¶ 15; 1/9/25 Hr'g Tr. 36:2-4, ECF No. 41 ("Hr'g Tr.").

[2] Musi claims that the Musi app "does not rely on YouTube's [API], nor do Musi's servers store, process, or transmit YouTube videos. Instead, the Musi app plays or displays content based on the user's own interactions with YouTube's website via Musi's proprietary interface." Wojnowski Decl. ¶ 2.

5

1  attempt to come to a timely resolution." Elkin Decl. Ex. B at 3, ECF No. 10-18. But this was
2  misleading: Musi had not yet communicated with YouTube after receiving Apple's August 8,
3  2024, notice. Hr'g Tr. 15:12-16:2. Rather, when Musi told Apple that it had "been in
4  communication directly" with YouTube, Musi was referring to the letter it sent in May 2021, in
5  which Musi called YouTube's complaints "unfounded." *See* Golinveaux Reply Decl. Ex. 1 at 1.

6  On August 14, 2024, Apple instructed Musi again to "contact YouTube Legal immediately
7  regarding this issue." Elkin Decl. Ex. B at 2. But Musi did not contact YouTube despite Apple's
8  insistence. *See* Hr'g Tr. 15:12-16:2. On September 6, 2024, YouTube wrote to Apple: "Musi has
9  not reached out to us . . . and [the Musi] app continues to violate our Terms of Service. We
10 request that you please proceed with removing [the Musi] app from the App Store." Elkin Decl.
11 Ex. B at 2. Finally, after receiving this email, Musi contacted YouTube directly on September 6,
12 2024, and repeated its position that the Musi app complies with YouTube's terms. Elkin Decl. Ex.
13 C at 1, ECF No. 10-19.

14 On September 11, 2024, the National Music Publishers Association (the "NMPA") wrote
15 to Apple that it "strongly supports YouTube's complaint against Musi" and asked Apple to
16 remove the Musi app from the App Store "expeditiously." Evan-Karimian Decl. Ex. 6 at 2, ECF
17 No. 30-14. The NMPA explained that the Musi app "offers an alternative user interface for
18 accessing the entire YouTube video library, except with ads served by Musi rather than
19 YouTube," and that "this ad manipulation serves to undermine NMPA members' various
20 YouTube licensing structures." *Id*. at 1. NMPA members license their works to YouTube and
21 "generate royalties according to a statutory formula tied to [YouTube's] revenue." *Id.* at 2. Thus,
22 "by muting YouTube's ads and replacing them with its own, Musi diverts royalties from music
23 publishers and songwriters to itself." *Id*. The NMPA letter also included analysis of Musi's code
24 to demonstrate how "Musi lays its own ads over YouTube's ads." *Id*. at 4.[3]

---

[3] Apple did not disclose the NMPA letter to Musi until Apple filed its opposition to Musi's Motion. Wojnowski Reply Decl. ¶ 15; Hr'g Tr. 36:23-37:2.

1    On September 18, 2024, Apple notified Musi that if the YouTube dispute "is not resolved
2    shortly, Apple may be forced to pull your application(s) from the App Store." Elkin Decl. Ex. D
3    at 3, ECF No. 10-20. But Musi did not commit to change the Musi app to address YouTube's
4    complaint. Instead, Musi complained to Apple that YouTube did not provide "any details to
5    substantiate its complaint." *Id*. at 1-2. On September 24, 2024, Apple removed the Musi app
6    from the App Store. Apple reminded Musi that it was Musi's responsibility "to resolve the matter
7    directly with [YouTube], or risk removal of [the Musi] app from the App Store." Elkin Decl. Ex.
8    E at 1, ECF No. 10-21. Because Musi failed to resolve YouTube's complaint, Apple removed the
9    Musi app from the App Store "on the basis of intellectual property infringement." *Id*. at 1.
10   Musi initiated this action on October 2, 2024, claiming that Apple's decision to remove the
11   Musi app from the App Store violated the DPLA and the implied covenant of good faith and fair
12   dealing. On October 9, 2024, Musi filed a motion for a preliminary injunction to prevent Apple
13   "from refusing to list or otherwise making unavailable the Musi app from the App Store."
14   Proposed Order at 2, ECF No. 10-22. After briefing concluded, the Court heard argument on
15   January 9, 2025. At the hearing, Musi acknowledged that it has not made any attempt to resolve
16   YouTube's complaints, and has not communicated with YouTube, since September 6, 2024. Hr'g
17   Tr. 18:6-13.

## II.   LEGAL STANDARD

19   "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*
20   *v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008). "In each case, courts 'must balance the
21   competing claims of injury and must consider the effect on each party of the granting or
22   withholding of the requested relief.'" *Id*. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S.
23   531, 542 (1987)). "A plaintiff seeking a preliminary injunction must establish that he is likely to
24   succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary
25   relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."
26   *Id.* at 20.
27   Under the Ninth Circuit's "sliding scale approach," a preliminary injunction may issue
28   where "serious questions going to the merits were raised and the balance of hardships tips sharply

7

in [the movant's] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). To raise serious questions, the movant's claim must be more than just "plausible." *Where Do We Go Berkeley v. California Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022). Rather, the movant must show that it has a "fair chance of success on the merits." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (quoting *Republic of the Philippines v. Marcos*, 862 F.3d 1355, 1362 (9th Cir. 1988) (en banc)). Under the sliding scale approach, the movant still must show "a likelihood of irreparable injury and that the injunction is in the public interest." *Cottrell*, 632 F.3d at 1135.

## III. DISCUSSION

The crux of Musi's complaint is that Apple breached the Apple Developer Program License Agreement and the implied covenant of good faith and fair dealing when it removed the Musi app from the App Store. Musi seeks a preliminary injunction that would prevent Apple "from refusing to list or otherwise making unavailable the Musi app from the App Store."[4] Proposed Order at 2.

The Court assumes, without deciding, that Musi seeks a prohibitory injunction rather than a mandatory one. Even with this assumption, Musi's request for a preliminary injunction must be denied because Musi fails to demonstrate serious questions going to the merits of its claims, let alone a likelihood of success on the merits. The DPLA, which governs the terms of Musi's use of the App Store, affords Apple broad discretion to remove applications "at any time, with or without cause." DPLA Schedule 1 § 6.3. Furthermore, on the current record, Musi has not raised serious questions that Apple acted unreasonably or in bad faith when it removed the Musi app after receiving several third-party complaints that went unresolved for months. Finally, Musi has also failed to show that its requested injunction would serve the public interest.

---

[4] Although it is framed in prohibitory terms, Musi's proposed injunction would have the effect of mandating that Apple reinstate the Musi app in the App Store. The Ninth Circuit has observed that the "sliding scale" standard might not apply when the movant seeks a mandatory injunction. *Doe v. Snyder*, 28 F.4th 103, 111 n.4 (9th Cir. 2022).

8

**A.      Serious Questions or a Likelihood of Success on the Merits**

**1.      Breach of Contract**

Musi's breach of contract claim requires "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). A contract must be interpreted "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. The contract's language governs if it is "clear and explicit." *Id*. § 1638.

As a condition of using Apple software and accessing the App Store platform, all third-party application developers, including Musi, agree to the DPLA. Relevant here, Musi agreed that the Musi app "will not violate, misappropriate, or infringe any Apple or third-party copyrights, trademarks, rights of privacy and publicity, trade secrets, patents, or other proprietary or legal rights." DPLA at 17. The DPLA includes the following termination clause:

> <u>Apple reserves the right to cease marketing, offering, and allowing download by end-users of the Licensed Applications at any time</u>, <u>with or without cause</u>, by providing notice of termination to You. <u>Without limiting the generality of this Section 6.3</u>, You acknowledge that <u>Apple may cease allowing download by end-users of some or all of the Licensed Applications</u>, or take other interim measures in Apple's sole discretion, <u>if Apple reasonably believes, based [on] human and/or systematic review, and, including without limitation upon notice received under applicable laws, that</u>: (i) those Licensed Applications are not authorized for export to one or more of the regions designated by You under Section 2.1 hereof, in accordance with the Export Administration Regulations or other restrictions; (ii) <u>those Licensed Applications and/or any end-user's possession and/or use of those Licensed Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party</u>; (iii) the distribution and/or use of those Licensed Applications violates any applicable law in any region You designate under Section 2.1 of this Schedule 1; (iv) You have violated the terms of the Agreement, this Schedule 1, or other documentation including without limitation the App Review Guidelines; or (v) You or anyone representing You or Your company are subject to sanctions of any region in which Apple operates. An election by Apple to cease allowing download of any Licensed Applications, pursuant to this Section 6.3, shall not relieve You of Your obligations under this Schedule 1.

DPLA Schedule 1 § 6.3 (emphasis added).

9

Musi has not raised serious questions that Apple breached the DPLA. The plain language of the DPLA governs because it is clear and explicit: Apply may "cease marketing, offering, and allowing download by end-users of the [Musi app] at any time, with or without cause, by providing notice of termination." *Id*. Based on this language, Apple had the right to cease offering the Musi app without cause if Apple provided notice of termination to Musi. On the current record, it is undisputed that Apple gave Musi notice of termination. Apple warned Musi multiple times that "Apple may be forced to pull [the Musi app] from the App Store" if Musi failed to resolve third-party complaints. Elkin Decl. Ex. D at 3; *see also* IFPI Dispute Email at 5, 59. Accordingly, Musi has not raised a serious question that Apple breached the DPLA.

Musi contends that more was required of Apple. Musi points to other language in the DPLA, which provides that "Apple may cease allowing download by end-users . . . if Apple <u>reasonably believes</u>, based [on] human and/or systematic review," that an application infringes intellectual property rights. DPLA Schedule 1 § 6.3 (emphasis added). Musi proposes that this "reasonable belief" clause limits Apple's right to cease offering an application "at any time, with or without cause." According to Musi, Apple was required to (1) conduct a "human and/or systematic review" of YouTube's complaint, and (2) based on that review, form a reasonable belief that the Musi app infringed intellectual property rights. Mot. at 14-15.[5]

The problem with Musi's construction of the DPLA is that the "reasonable belief" clause expressly does not "limit[] the generality" of Apple's right to cease offering an application "at any time, with or without cause." DPLA Schedule 1 § 6.3. When a contract's plain language expressly states that a clause is not limiting, a court should not construe the clause as a limitation. *See FTC v. EDebitPay, LLC*, 695 F.3d 938, 943 (9th Cir. 2012) (holding that the phrase "including but not limited to" is a "phrase of enlargement" indicating that "enumerated examples following the phrase should not be construed as an exhaustive listing"). Moreover, Musi's proposed

---

[5] In its reply brief, Musi points to Section 4.1(g) of the DPLA. Reply at 8. But this provision imposes an obligation on Musi, not on Apple, and it does not waive Apple's termination rights. DPLA Schedule 1 § 4.1(g) (requiring developers "to permit Apple to share [their] contact information with the party filing [a] dispute and to follow Apple's app dispute process on a non-exclusive basis and without any party waiving its legal rights").

construction would read the "without cause" clause, and the "without limiting" clause, out of the DPLA entirely.

Judge Cousins' opinion in *Intango, Ltd. v. Mozilla Corp.* is instructive. No. 20-cv-02688-NC, 2020 WL 12584274 (N.D. Cal. Aug. 25, 2020). In that case, the plaintiff made add-ons for Mozilla's Firefox browser. Mozilla disabled the plaintiff's add-ons because they allegedly violated Mozilla's distribution agreement by "secretly redirecting its users' internet searches and tracking its users' search activity." *Id*. at *1. Mozilla's distribution agreement provided that:

> Mozilla <u>reserves the right</u> (though not the obligation) <u>to, in [Mozilla's] sole discretion, remove or revoke access to any Listed or Unlisted Add-ons</u>. <u>This applies, but is not limited to, Add-ons that, in [Mozilla's] reasonable opinion, violate this Agreement or the law, any applicable Mozilla policy</u>, or is in any way harmful or objectionable. In addition, <u>[Mozilla] may at any time remove Your Add-on</u> from AMO; revoke Your Mozilla Certificate; blocklist an Add-on; delete your AMO account; flag, filter, modify related materials (including but not limited to descriptions, screenshots, or metadata); reclassify the Add-on; or take other corrective action.

*Id.* at *6 (emphasis added). This language, including the provision that Mozilla "may at any time remove" add-ons, gave Mozilla broad discretion to remove the plaintiff's add-on. Judge Cousins held that Mozilla's right to remove add-ons was expressly "'not limited to' situations where Mozilla found that the add-on violates Mozilla policy." *Id*. The same is true here. The DPLA provides example circumstances under which Apple may cease offering an application, and those examples do not limit the broad discretion that Apple reserved for itself.[6]

Musi cites cases that are inapposite or affirmatively unhelpful to its argument. For example, in *Marder v. Lopez*, the plaintiff argued for a narrow construction of a settlement release provision by pointing to examples of claims that she had released. 450 F.3d 445, 451 (9th Cir. 2006). The Ninth Circuit rejected the narrow construction because the settlement listed the examples "[w]ithout limiting the generality" of the release. *Id*. at 451-52.

---

[6] Musi argues that "[u]nlike Apple's conduct here, Mozilla engaged in 'extensive' discussions with Intango before blocking and disabling Intango's add-ons." Mot. at 17. But Musi's summary of *Intango* is inaccurate. The plaintiff in *Intango* alleged that Mozilla blocked its add-ons without any prior warning and then removed the add-ons again to Intango's shock. *Intango*, 2020 WL 12584274, at *1-2. In any event, Judge Cousins decided the case based on the plain language of the agreement, not based on Mozilla's course of conduct.

11

Musi also relies on *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027 (2008). In that case, a company alleged that its former employee violated a confidentiality agreement by making statements about the employee's working conditions. *Id.* at 1046. The confidentiality agreement prohibited the former employee from disclosing "any information, knowledge or data of the Company." *Id.* at 1044. The court reasoned that this phrase was "susceptible of more than one interpretation," so it "must be construed in light of the kinds of protected information enumerated in the sentence that follows." *Id.* at 1046 & n.5. By contrast, the clause in the DPLA that Musi seeks to limit is unambiguous: it provides that Apple may cease offering an application "at any time, with or without cause." DPLA Schedule 1 § 6.3 ("Apple reserves the right to cease marketing, offering, and allowing download by end-users of the Licensed Applications at any time, with or without cause, by providing notice of termination to You.").

Additionally, Musi has not raised serious questions going to the merits of its breach of contract claim even under Musi's own construction of the DPLA. Under Musi's construction, Apple was required to form a reasonable belief that the Musi app infringes third-party intellectual property rights. As recounted above, from July 27, 2023, through at least May 7, 2024, Apple received repeated complaints of infringement from the IFPI. *See generally* IFPI Dispute Email. The IFPI substantiated its complaint with purported evidence of infringement, IFPI Dispute Email at 11-12, and threatened that Apple could be liable for Musi's conduct. Yet Musi did not resolve the IFPI complaints.

Musi did not resolve YouTube's complaint, either. The heart of YouTube's complaint is that Musi sells its own advertising for display on the Musi app that replaces YouTube's advertising, even though Musi app users are streaming content from YouTube. *See* Compl. ¶ 32; *see also* Elkin Decl. ¶ 2. Musi does not deny the factual basis of YouTube's complaint.[7] Instead,

---

[7] In its briefing, Musi carefully states that it "does not interfere with any ads to the extent they are included within the publicly-available video media that is streamed by the Musi app's user." *See* Reply at 6, ECF No. 31. But this does not tell the whole story. At the motion hearing, Musi acknowledged that it does not display advertisements that YouTube serves when a user views the same content directly through YouTube's interface. Hr'g Tr. 13:13-25 (admitting that "a user will see ads when viewing videos on the YouTube website using the YouTube player that they will not see when using the Musi app"); *see also id*. at 14:9-10, 15:8-10.

12

Musi defends its business model: it argues that the "functionality offered by the Musi app is of sufficient value to justify Musi's advertisement sales." Golinveaux Reply Decl. Ex. 1 at 2. YouTube's complaint was substantiated by the NMPA's letter, which analyzed bits of Musi's code and explained that Musi "diverts royalties from music publishers and songwriters to itself." Evan-Karimian Decl. Ex. 6 at 2, 4. Accordingly, at the time Apple removed the Musi app from the App Store, Apple faced at least two unresolved complaints that were supported by some evidence.

To be clear, the Court is not deciding, and has not been asked to decide, the merits of any third-party complaint against Musi. The relevant question, under Musi's construction of the DPLA, is whether Apple formed a reasonable belief that the Musi app was infringing third-party intellectual property rights. At this stage, the record reflects that Apple received multiple complaints about the Musi app from different third parties. These complaints were supported by some evidence, and they went unresolved for months. The record also reflects that Musi's responses were not always diligent, and they did not assure Apple that Musi was making progress to resolve the complaints of infringement. On the current record, Musi has not raised a serious question that Apple's decision to remove the Musi app due to alleged infringement was unreasonable.

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

Musi also claims that Apple violated the covenant of good faith and fair dealing. "[B]reach of a specific provision of [a] contract is not a necessary prerequisite" for a claim alleging violation of the covenant of good faith and fair dealing. *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc*., 2 Cal. 4th 342, 373 (1992) (in bank). However, "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Id.* Therefore, the implied covenant cannot require action that contradicts the rights and obligations set forth by a contract's express terms. The Supreme Court of California has observed: "We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms." *Id.* at

13

373-74; *see also Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 885 (N.D. Cal. 2015) ("Plaintiffs cannot state a claim for breach of the implied covenant of good faith and fair dealing, because 'if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.'" (quoting *Carma*, 2 Cal. 4th at 374)).

      Musi has not raised a serious question or shown a likelihood of success on its claim that Apple acted in bad faith. Based on the plain language of the DPLA, Apple had the express right to remove the Musi app from the App Store "at any time, with or without cause." DPLA Schedule 1 § 6.3. The covenant of good faith and fair dealing cannot impose an obligation on Apple that contradicts this express term. *Carma*, 2 Cal. 4th at 373-74; *see also Intango*, 2020 WL 12584274, at *7 (holding that a claim for beach of the implied covenant was "precluded by the specific terms" of the agreement, which permitted defendant to remove plaintiff's browser add-ons "at any time").

      Additionally, Musi's complaints of bad faith are not supported by the current record. Musi says that Apple "never explained the bases for" YouTube's complaint, Mot. at 15, but Musi was well aware of the bases for the complaints against it. When Apple notified Musi of the complaint in August 2024, Musi responded that it has "been in communication directly with [YouTube] on this matter." Elkin Decl. Ex. B at 3. Musi was referring to its prior correspondence with YouTube in 2021 regarding the same YouTube complaints, which Musi disputed. Musi complains that "Apple inserted itself into the dispute as arbiter and then had discussions with only one side." Reply at 8. Although Apple did not disclose that it had a call with YouTube or received a letter from the NMPA, these developments did not raise new bases for removing the Musi app. During the phone call, YouTube "confirmed" the position it raised in prior complaints. Evan-Karimian Decl. ¶ 7. And the NMPA letter provided purported evidence to support YouTube's familiar complaint that Musi replaces YouTube advertising with its own, to the alleged detriment of copyright owners who license their works to be displayed via YouTube.

      Musi relies on two primary cases to support its position that Apple acted in bad faith by abusing its discretion. *See InfoStream Grp., Inc. v. PayPal, Inc.*, No. C 12-748 SI, 2012 WL 3731517 (N.D. Cal. Aug. 28, 2012); *Campbell v. eBay, Inc.*, No. 13-CV-2632 YGR, 2014 WL

3950671 (N.D. Cal. Aug. 11, 2014).[8]  These cases held only that the plaintiffs plausibly alleged a breach of the implied covenant, but Musi must show more than a plausible claim to obtain the extraordinary remedy of a preliminary injunction.  *Where Do We Go Berkeley*, 32 F.4th at 863.

Because Musi has failed to show serious questions going to the merits, let alone a likelihood of success, the Court need not reach the other *Winter* elements.  *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1126 (9th Cir. 2024) ("[I]f a movant fails to meet the threshold inquiry of likelihood of success on the merits (or serious questions going to them), a court may decide to deny a preliminary injunction without considering the other factors."); *see also Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) ("Likelihood of success on the merits 'is the most important' *Winter* factor; if a movant fails to meet this 'threshold inquiry,' the court need not consider the other factors" in the absence of "serious questions going to the merits." (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)).  However, the Court will also address whether Musi's proposed injunction is in the public interest.

### B.     The Public Interest

"[T]he public interest inquiry primarily addresses impact on non-parties rather than parties."  *hiQLabs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022) (quoting *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931-32 (9th Cir. 2003)).  Here, the Court considers the public interest element because the impact of Musi's requested injunction would reach "beyond the parties, carrying with it a potential for public consequences."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).

Musi's requested preliminary injunction would prohibit Apple "from refusing to list or otherwise making unavailable the Musi app from the App Store."  Proposed Order at 2.  The practical effect of this injunction, if entered, would be to compel Apple to continue to offer the Musi app for download by potentially millions of new users before the merits of Musi's claims are decided.  *See* Wojnowski Reply Decl. ¶ 2 (discussing the Musi app's average new user growth

---

[8] Musi did not cite these cases in its briefing on the Motion, but rather cited them in a case management statement filed after briefing was closed.  Joint Case Mgmt. Statement at 12, ECF No. 36.

before the it was removed from the App Store). A court order to that effect would plainly implicate the rights of the third parties whose complaints catalyzed the Musi app's removal in the first place. The complaints allege that Musi unlawfully diverts royalties away from numerous artists and other rights holders through its advertising practices. Without addressing the merits of these complaints, the Court recognizes that there is a strong public interest in protecting intellectual property rights. *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019).

Musi has not presented any compelling public interest to counterbalance the potential violation of third-party intellectual property rights. Musi argues that "Apple's conduct implicates nearly 2 million third-party iOS developers," Mot. at 12-13, but there is no evidence in the record of any misconduct by Apple with respect to any iOS developer. Moreover, Musi's proposed injunction would require Apple to reinstate the Musi app; it would not confer any benefit on any developer other than Musi. Accordingly, the Court finds that a preliminary injunction is not in the public interest.

## IV. CONCLUSION

For the foregoing reasons, Musi is not entitled to the extraordinary remedy of a preliminary injunction. Musi's Motion is DENIED without prejudice to renewal. In reaching this conclusion, the Court does not express any opinion on the merits of third-party complaints against Musi, which are not before the Court. The Court also does not address whether Musi could plausibly state a claim against Apple, as that question is appropriately reserved for Apple's forthcoming motion to dismiss Musi's amended complaint.

**IT IS SO ORDERED.**

Dated: January 30, 2025

Eumi K. Lee
United States District Judge